Laura Denvir Stith, Judge
Vincent McFadden appeals the motion court's denial of postconviction relief from his conviction and death sentence for the first-degree murder of Leslie Addison. He claims the motion court committed multiple errors, including that the judge should have permitted him to question all jurors instead of just two jurors in an attempt to prove a juror knew Mr. McFadden previously, that the postconviction process was tainted by a ruling on the juror issue by a judge who later recused, and that defense counsel were ineffective in failing to call additional lay and expert witnesses in the guilt and penalty phase. This Court holds the motion court's findings of fact and conclusions of law are not clearly erroneous. The judgment denying postconviction relief is affirmed.
I. FACTUAL AND PROCEDURAL BACKGROUND
The detailed facts are set out in Mr. McFadden's prior appeals and will be repeated here only insofar as they are relevant to his postconviction claims. On May 15, 2003, Eva Addison[1] was at Maggie Jones' house on Blakemore in Pine Lawn when Mr. McFadden arrived at the house with a friend.[2] Eva and Mr. McFadden had a child together. When Mr. McFadden got out of the car, he kissed the child, slapped Eva, and told her she and her two sisters, Leslie and Jessica, needed to stay out of Pine Lawn. Mr. McFadden and his friend then got back in the car and left.
When Leslie and Jessica later arrived, Eva told them of Mr. McFadden's warning and advised them to leave Pine Lawn. Jessica left with Eva's child soon thereafter. Before Leslie could leave, Mr. McFadden returned with his friend, as did another friend of Mr. McFadden's, Arnell Jackson, driving a separate car. Mr. McFadden and Leslie got into an argument outside of the house. He pointed a gun at her and pulled the trigger, but the gun did not fire. Mr. Jackson told Mr. McFadden to leave the women alone because he knew Mr. McFadden was wanted for the murder of Todd Franklin. As Mr. McFadden turned to leave, he stated, "one of these 'ho's' has got to die tonight." He and his friends then got back in their cars.
Before driving away, Mr. McFadden got out of his friend's car and started to walk back toward Ms. Jones' house, but before reaching it, he heard police sirens and quickly fled. In the meantime, Leslie began walking down Blakemore and turned on Naylor and Kienlen to go to a nearby *297 payphone to call for a ride out of Pine Lawn. Eva saw the car Mr. McFadden had been riding in come around a corner onto Kienlen and ran to urge Leslie to come back to the house, but Leslie waved her off and continued walking toward the payphone. Eva then saw Mr. McFadden get out of the friend's car and walk toward Leslie. Afraid, Eva hid in some nearby bushes. She heard Mr. McFadden yelling at Leslie and watched him shoot her several times. Leslie died from a gunshot wound to her head.
Police arrested Mr. McFadden two days later. The State charged him with first-degree murder, armed criminal action, and tampering with a witness. A jury found him guilty on all three counts in 2005 and recommended the death penalty. This Court reversed and remanded for a new trial in State v. McFadden, 216 S.W.3d 673, 677 (Mo. banc 2007), because the State's discriminatory jury selection in the first trial violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) , and because Mr. McFadden's prior convictions for armed criminal action and the murder of Mr. Franklin, which had been submitted as statutory aggravators, later were reversed in State v. McFadden, 191 S.W.3d 648 (Mo. banc 2006) .[3]
The State retried Mr. McFadden for Leslie's death in 2008. During the guilt phase of his second trial, the State presented testimony from Eva, the only eyewitness to the murder. Evelyn Carter and Jessica also testified, corroborating various aspects of Eva's testimony. So too did Stacy Stevenson, a nearby neighbor, who said he heard two women arguing in the street, watched as a man followed a woman around the corner on Kienlen, and then heard arguing followed by gunshots. After the gunshots, Mr. Stevenson ran toward the shots, saw Leslie's body lying in the street, and called 911. The State also called the paramedic who first arrived at the scene, the police officer who investigated the case, three detectives, and a medical doctor. Mr. McFadden did not testify or present any evidence during the guilt phase. The jury found him guilty of first-degree murder, armed criminal action, and witness tampering.
Both the prosecution and defense presented evidence during the penalty phase. The State submitted two statutory aggravators based on Mr. McFadden's previous convictions of first-degree murder and armed criminal action for killing Mr. Franklin with a deadly weapon. The State submitted four additional statutory aggravators based on his convictions on two counts of first-degree assault and two counts of armed criminal action for shooting at Daryl Bryant and Jermaine Burns. The State entered certified copies of those convictions into evidence and elicited testimony from witnesses about the underlying facts of those crimes. The State also presented evidence of non-statutory aggravating circumstances, including that Mr. McFadden made earlier threats to the Addison sisters and lacked remorse for murdering Mr. Franklin.
The same two counsel represented Mr. McFadden in his first trial for the murder of Leslie and in both trials for the murder of Mr. Franklin. In all three trials, defense counsel presented experts to help the jury understand Mr. McFadden's limited mental capacity, the effect on him of childhood *298 traumas, and the difficulties he faced growing up poor and bullied in Pine Lawn. Counsel believed these experts failed to "relate" to the jury and their testimony distracted from lay witness testimony about these issues. Counsel made the strategic decision to present mitigation testimony about these issues in the retrial regarding Leslie's murder using only lay witnesses, as is discussed in more detail later in this opinion.
The jury found all six statutory aggravators beyond a reasonable doubt and recommended a death sentence, which the circuit court imposed. This Court upheld the conviction and sentence. State v. McFadden, 391 S.W.3d 408 (Mo. banc 2013) .
Mr. McFadden timely filed pro se and amended motions seeking postconviction relief pursuant to Rule 29.15. After an evidentiary hearing, the motion court denied relief. Mr. McFadden appeals. Because the sentence imposed was death, this Court has jurisdiction. Mo. Const. art. V, sec. 10 ; Standing Order, June 16, 1988 (eff. July 1, 1988).
II. STANDARD OF REVIEW
"This Court reviews an order overruling a Rule 29.15 motion for postconviction relief to determine 'whether the motion court's findings of fact and conclusions of law are clearly erroneous.' " Gittemeier v. State, 527 S.W.3d 64, 67 (Mo. banc 2017), quoting, Price v. State, 422 S.W.3d 292, 294 (Mo. banc 2014) ; 29.15(k). This standard is met if the appellate court is left with a "definite and firm impression that a mistake has been made." Id. at 67-68 . "This Court presumes that the motion court's findings are correct." Barton v. State, 432 S.W.3d 741, 748 (Mo. banc 2014) (citation omitted). This Court defers to "the motion court's superior opportunity to judge the credibility of witnesses." Id. at 760, quoting, State v. Twenter, 818 S.W.2d 628, 635 (Mo. banc 1991).
To prevail on a claim of ineffective assistance of counsel, a postconviction movant must satisfy the two-prong test set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) . "Under Strickland , a movant must demonstrate: (1) his or her counsel failed to exercise the level of skill and diligence that a reasonably competent counsel would in a similar situation, and (2) he or she was prejudiced by the failure." Johnson v. State, 406 S.W.3d 892, 898-99 (Mo. banc 2013) . "Both of these prongs must be shown by a preponderance of the evidence in order to prove ineffective assistance of counsel." Zink v. State, 278 S.W.3d 170, 175 (Mo. banc 2009) (citation omitted).
There is "a strong presumption that counsel's conduct was reasonable and effective to meet the first prong of the Strickland test." Id. at 176 , 104 S.Ct. 2052. To overcome that presumption of reasonableness, a movant must point to "specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." Anderson v. State, 196 S.W.3d 28, 33 (Mo. banc 2006) (citation omitted). "[C]ourts distinguish between actions that result from inadequate pretrial preparation and those that are the product of trial strategy decisions." Chambers v. Armontrout, 907 F.2d 825, 835 (8th Cir. 1990) . "Counsel is not ineffective as long as the investigation is reasonable." Middleton v. State, 80 S.W.3d 799, 809 (Mo. banc 2002), citing, Strickland, 466 U.S. at 691, 104 S.Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible opinions are virtually unchallengeable." Strickland, 466 U.S. at 690 , 104 S.Ct. 2052.
*299 To prove the prejudice prong of Strickland , "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695 , 104 S.Ct. 2052. When the issue is whether to grant a new trial on the imposition of a sentence of death the Court determines "whether there is a reasonable probability that, absent the errors, the [jury] ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id.
III. ALLEGED POSTCONVICTION RELIEF PHASE ERRORS
In his postconviction motion, Mr. McFadden claimed the circuit court erred in limiting his ability to inquire into whether Juror Williams intentionally lied during voir dire when he said he did not recognize Mr. McFadden. In preparing Mr. McFadden's appeal, appellate counsel learned Juror Williams had served on the venire panel of one of Mr. McFadden's unrelated previous assault cases but was not chosen as a juror. On direct appeal, Mr. McFadden alleged Juror Williams' failure to disclose he had been on the venire panel was intentional and not simply a result of a faded memory. This Court rejected the claim because the record contained no factual basis to support the claim the nondisclosure was intentional. McFadden, 391 S.W.3d at 417-19 .
In preparing his postconviction motion, Mr. McFadden's motion counsel attempted to correct his deficiency of proof on direct appeal by moving for permission to contact all 170 venire members to ask them if Juror Williams told them he knew Mr. McFadden. St. Louis County local rule 53.3 provides in pertinent part:
Petit jurors shall not be required to provide any information concerning any action of the petit jury, unless ordered to do so by the Court.... If an attorney or party receives evidence of misconduct by a petit juror, the attorney or party shall inform the Court and the Court may conduct an investigation to establish the accuracy of the misconduct allegations.
Judge Goldman, over objection, granted the motion in part, ruling he would examine Juror Williams and another randomly selected person who actually served as a juror. Judge Goldman did so in September 2013, in chambers and on the record. Juror Williams repeatedly stated he did not remember Mr. McFadden from the prior assault case. The randomly chosen other juror, who had been sitting next to Juror Williams during trial, testified she did not hear anything to suggest Juror Williams remembered Mr. McFadden from being on the venire or otherwise. Motion counsel did not renew his request to question all 170 venire members but did again request permission to question "all the jurors who sat on the jury, even the individuals who were the alternates." Judge Goldman denied counsel's request for additional inquiry.
In May 2014, while the postconviction motion was still pending but after interviewing the two jurors, Judge Goldman recused himself from further postconviction proceedings because he realized he often talked about pending cases not assigned to him with one of the local prosecutors, and it was this prosecutor who tried Mr. McFadden's underlying death penalty case. Although Judge Goldman did not recall the prosecutor discussing Mr. McFadden's case with him, since it was possible that had occurred Judge Goldman recused himself "out of an abundance of caution" because "this was such a serious case."
The case was reassigned to Judge Dolan. Counsel renewed the motion to contact *300 additional jurors. Judge Dolan overruled the motion. The case later was reassigned to Judge DePriest, who overruled yet another motion to interview additional jurors. Judge DePriest held a further evidentiary hearing but did not permit counsel to call further jurors for questioning at that hearing. He then overruled Mr. McFadden's postconviction motion.
A. The Motion Court Did Not Err in Limiting Juror Questioning
Mr. McFadden asserts all three judges clearly erred in denying his counsel's request to question all members of the jury. He argues this alleged error violated his Eighth Amendment rights but does not explain how a discovery ruling in a postconviction proceeding, even if incorrect, could violate his right to be free of cruel and unusual punishment under the Eighth Amendment, nor does he cite any authority for such a proposition. This Court does not address it further.
Mr. McFadden also argues the failure to question additional jurors hindered his ability to show Juror Williams was biased and his presence on the jury violated Mr. McFadden's due process right to a fair and impartial jury. There is "no inherent right to contact and interview jurors." Strong v. State, 263 S.W.3d 636, 643 (Mo. banc 2008) . Rather, "[c]ourts have discretionary power to grant permission for contact with jurors after a trial." Id. (citation omitted). In Strong, this Court found no error in a motion court's denial of any juror contact when the defendant requested to contact jurors to investigate and prove claims of ineffective assistance of counsel and juror misconduct because there was no "reasonable cause to believe, from actual factual allegations, that defendant's rights had been violated." Id . In State v. Jones, 979 S.W.2d 171, 183 (Mo. banc 1998) , this Court affirmed the motion court's order permitting juror contact but limiting the issues about which jurors could be questioned.
In this instance, Mr. McFadden's counsel sought to find out whether Juror Williams remembered Mr. McFadden from the earlier assault case even though Juror Williams did not sit on the jury in the assault case and did not raise his hand when asked during voir dire in the instant case whether he recognized Mr. McFadden. Counsel had no specific reason to believe Juror Williams lied in stating he did not recognize Mr. McFadden but thought it did not sound likely. Judge Goldman, therefore, allowed questioning of Juror Williams and another juror. Nothing in the initial inquiry of these two jurors suggested the nondisclosure was intentional rather than simply a result of faded memory. Juror Williams repeatedly denied recognizing or remembering Mr. McFadden:
THE COURT: Do you remember being asked if you recognized Vincent McFadden?
[JUROR] WILLIAMS: Yes, sir.
THE COURT: And you did not respond to that as recognizing him; is that right?
[JUROR] WILLIAMS: Yeah, I didn't know him.
THE COURT: Okay. Do you remember being asked if you had acquired any information about Mr. McFadden from any source?
[JUROR] WILLIAMS: Yes, sir.
THE COURT: And again, you did not respond to that?
[JUROR] WILLIAMS: Correct.
THE COURT: At any time, Mr. Williams, from the beginning of the trial with the jury selection until the verdicts of guilty and verdict with the sentence, do you recall knowing Mr. McFadden from before the trial?
[JUROR] WILLIAMS: No, sir.
*301 THE COURT: About three years before that trial, or slightly before three years, were you on a jury selection and not selected as a juror on an assault first-degree case or assault case?
[JUROR] WILLIAMS: I don't remember.
THE COURT: Okay. Coming before just for the jury selection where they asked you questions, do you recall doing that about three years before that?
[JUROR] WILLIAMS: I believe so. It's been so long ago I don't remember.
THE COURT: Okay. During the trial of Mr. McFadden on the-the trial the trial that you were on where you reached a verdict, the murder case, during that trial did you ever recall Mr. McFadden from the jury selection process that happened about three years before?
[JUROR] WILLIAMS: No.
....
THE COURT: Mr. Williams, did you tell anyone during the murder first degree trial that you had been exposed to Vincent McFadden in the past?
[JUROR] WILLIAMS: No.
THE COURT: Okay. So you never said anything. Did you recognize him from the past?
[JUROR] WILLIAMS: No, I never-I don't know him at all.
The randomly selected juror confirmed Juror Williams did nothing to indicate he recalled Mr. McFadden:
THE COURT: Okay. [Juror], did you become aware at any time during the trial of any juror recalling knowing Mr. McFadden or recognizing Mr. McFadden from before the trial?
[JUROR]: No.
THE COURT: Okay. Do you recall juror No. 3, a man named [Juror] Williams?
[JUROR]: Not specifically, no.
THE COURT: Okay. Did you overhear any juror discussing previous knowledge of Mr. McFadden at any time while you were here during the course of the trial?
[JUROR]: No.
Although Judge Goldman may have had the discretion to allow additional juror questioning, motion counsel identified nothing which indicated that other jurors would have had different information and that the failure to allow other jurors to be questioned was an abuse of discretion. Mr. McFadden has failed to show why examining the rest of the jurors was anything other than a fishing expedition. Cf. Concerned Citizens for Crystal City v. City of Crystal City, 334 S.W.3d 519, 523 (Mo. App. E.D. 2010) (concluding "the provisions of discovery were neither designed nor intended for untrammeled use of a factual dragnet or fishing expedition") (internal quotations and citation omitted).
In the absence of proof of intentional nondisclosure, " 'a new trial is not warranted unless prejudice resulted from the nondisclosure that may have influenced the jury's verdict.' " McFadden, 391 S.W.3d at 418, quoting, St. Louis Univ. v. Geary, 321 S.W.3d 282, 295 (Mo. banc 2009). No basis for finding prejudice has been shown.
B. Denial of Additional Questioning of Juror Williams
Next, Mr. McFadden contends, once Judge Goldman recused himself, all his prior questioning of Juror Williams and the other juror should have been disregarded as a nullity. As a result, he says he "was denied due process, and freedom from cruel and unusual punishment, U.S. Const. Amends. VIII and XIV" when Judges Dolan and DePriest relied on Judge Goldman's questioning.
*302 Mr. McFadden fails to explain how the failure to allow additional questioning of a particular witness at a postconviction hearing could be cruel and unusual punishment; it is not punishment at all. The death penalty was imposed in his underlying trial, not during his postconviction proceedings. This argument is rejected. Similarly, to the extent Mr. McFadden argues he had a due process right to a postconviction hearing, Missouri law is well-settled: "Individuals convicted of state crimes have 'no federal constitutional right to a state post-conviction proceeding' " in the first instance. Price, 422 S.W.3d at 296, quoting, Smith v. State, 887 S.W.2d 601, 602 (Mo. banc 1994). Any such right to a postconviction proceeding exists only by statute or this Court's rules, and the United States Supreme Court has stated "we are unwilling to accept [ ] that when a State chooses to offer help to those seeking relief from convictions, the Federal Constitution dictates the exact form such assistance must assume." Pennsylvania v. Finley, 481 U.S. 551, 559, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) .
Mr. McFadden is correct, however, that once a defendant has been granted a postconviction hearing by statute or rule, he has a right to an unbiased judge. "Due process concerns permit any litigant to remove a biased judge." Thomas v. State, 808 S.W.2d 364, 367 (Mo. banc 1991) . But here, Mr. McFadden has failed to show Judge Goldman was biased or was affected by any extrajudicial information.
Rule 2-2.11(A) provides, "A judge shall recuse himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned," including situations when the judge "has a personal bias or prejudice concerning a party ... or knowledge of facts that are in dispute in the proceeding that would preclude the judge from being fair and impartial." "It is presumed that a judge acts with honesty and integrity and will not undertake to preside in a trial in which the judge cannot be impartial." Smulls v. State, 10 S.W.3d 497, 499 (Mo. banc 2000) (citation omitted). "This presumption can be overcome and disqualification is required if a reasonable person would find an appearance of impropriety and doubt the impartiality of the court," but there "must be a factual context that gives meaning to the kind of bias that requires disqualification of a judge." Id., citing Haynes v. State, 937 S.W.2d 199, 203 (Mo. banc 1996). Smulls noted:
Specifically, a disqualifying bias or prejudice is one that has an extrajudicial source and results in an opinion on the merits on some basis other than what the judge learned from the judge's participation in a case. In cases requiring recusal, the common thread is either a fact from which prejudgment of some evidentiary issue in the case by the judge may be inferred or facts indicating the judge considered some evidence properly in the case for an illegitimate purpose.
Id. (internal citations and quotations omitted).
This standard was applied in Martin v. State, 526 S.W.3d 169, 187 (Mo. App. W.D. 2017) , to hold merely talking with a party ex parte does not provide a basis for recusal. In Martin , the State had an ex parte contact with the judge, but the defendant failed to present any objective facts revealing "any extrajudicial information that came to [the judge's] attention" or "any aspect of [the judge's] ruling on the Rule 29.15 Motion that could be attributed to reliance on extrajudicial information." Id.
In contrast is Anderson v. State, 402 S.W.3d 86, 92 (Mo. banc 2013) , in which a motion court made multiple on-the-record "references to the judge's out-of-court conversations with the foreperson of the jury"
*303 in Anderson's trial about subjects implicated in Anderson's postconviction motion. The record also revealed the motion court gave counsel a magazine article, which the court procured on its own, implicating the credibility of Anderson's mental health expert. Id. at 93 . This Court held the content of the conversations and the magazine article were clearly extrajudicial, and "[b]ased on the motion court's statements throughout the proceedings on the Rule 29.15 motion, a reasonable person would have factual grounds to believe the motion court relied on its conversations with the jury foreperson, the [ ] article or both in deciding the issues in the case." Id. at 94 . This Court, therefore, held the motion court judge should have been disqualified from the case. Id.
Similarly, in Smulls , this Court held a motion court judge from St. Louis County abused his discretion in failing to appoint another judge to determine whether he must be disqualified from the case when the judge in the original trial testified "he had discussions with every judge on the St. Louis County bench ... regarding the claim of racial bias [in the trial]," and " 'everybody' that he talked to about the charges of racial bias, based on their knowledge of the [original] opinion of this Court, expressed views that were not in agreement with what the opinion said." 10 S.W.3d at 504 . This Court held, the original trial judge's "deposition provides a factual basis for a reasonable person to question the nature and extent of [the motion court judge's] previously expressed opinions on the issue of [ ] alleged racial bias." Id.
Here, Judge Goldman did not recuse himself because he believed he had been exposed to extrajudicial information about Mr. McFadden. To the contrary, he denied recalling he received any extrajudicial information about Mr. McFadden. Judge Goldman recused himself simply because he "thought that [the prosecutor] may have talked to me about it, even though I really didn't remember anything about him talking to me about it. But he did talk to me about cases occasionally. So I thought in just an abundance of caution, because this was such a serious case, I didn't want that to be a factor in it."
Mr. McFadden offered no contrary evidence. The only other witness on this issue, the prosecutor, also did not recall specifically discussing Mr. McFadden's case with Judge Goldman. He simply speculated in his deposition that he often discussed cases with Judge Goldman and so "I may very well have discussed any one of those cases with the Judge in terms of telling him what the facts were, or that I had a murder case pending." He stated, "I probably very well talked to Judge Goldman about the facts of the case, back in '07 and '08. And then after the trial, what some of the highlights were." But he made clear: "I don't have any specific memory of any specific conversations with Judge Goldman about any of [the McFadden] cases." Rather, he stated, "I don't have any specific recollection of it, but it is very well possible that I probably did."
Furthermore, Mr. McFadden does not suggest Judge Goldman and the prosecutor discussed Juror Williams or anything to do with the jurors or the prior assault trial. This is key, for whether Juror Williams intentionally failed to say he had sat on the earlier jury venire is the only issue Mr. McFadden alleges was affected by Judge Goldman's early involvement in the postconviction process prior to his recusal. Mr. McFadden does not explain how this could have been affected by unremembered facts that might or might not have been stated about his prior trial.
Finally, "[a]n ex parte contact is not in and of itself sufficient to permit a *304 reasonable person to infer the existence of disqualifying bias emanating from an extrajudicial source and resulting in an opinion on the merits on some basis other than what a judge learned from participation in the case." Martin, 526 S.W.3d at 187, citing, Haynes, 937 S.W.2d at 202. Even if Judge Goldman and the prosecutor discussed Mr. McFadden's case in a now-forgotten conversation not involving Juror Williams, in the absence of any showing that Judge Goldman's examination of Juror Williams or the other juror biased or affected the later independent rulings by two other judges, no basis for a new postconviction hearing on the issue of further jury questioning has been shown. It was not Judge Goldman but Judge DePriest who overruled Mr. McFadden's postconviction motion. The record shows neither he nor Judge Dolan relied on Judge Goldman's evaluation of the credibility of Juror Williams and the other juror. Rather, they independently concluded further juror questioning was not necessary after reviewing the testimony given by the jurors.[4] Judge DePriest found:
After review of the testimony of the two (2) jurors, this court finds the inquiry to be sufficient to investigate possible juror bias on the part of [Juror] Williams. Further inquiry of all potential jurors is unnecessary given [Juror] Williams disclosures which indicate an unintentional nondisclosure as a result of a faded memory due to the passage of more than three (3) years.
It was within Judge DePriest's discretion to reach this finding based on his independent review of the record, and Mr. McFadden presented no other witnesses or evidence supporting a contrary finding. Indeed, he does not indicate anything Judge Goldman did not ask these jurors that some other judge would or should have asked.
IV. ALLEGED GUILT PHASE ERRORS
A. Failure to Properly Voir Dire Juror Williams
"A defendant has a right to a fair and impartial jury." Knese v. State, 85 S.W.3d 628, 632 (Mo. banc 2002), citing, U.S. Const. amends. VI, XIV ; Mo. Const. art. 1, sec. 18(a). "There is no rigid formula for an adequate voir dire," State v. Ousley, 419 S.W.3d 65, 73 (Mo. banc 2013) , but "[o]ne aspect of this right is adequate voir dire to identify unqualified jurors." Knese, 85 S.W.3d at 632.
In Mr. McFadden's second trial for Leslie's murder, the circuit court asked the venire panel, "Does anyone think they recognize Mr. Vincent McFadden?" No one, including Juror Williams, indicated they did. Mr. McFadden argues defense counsel were ineffective in not specifically asking Juror Williams additional questions about whether he recognized Mr. McFadden because Mr. McFadden indicated to defense counsel at some point during the voir dire that Juror Williams looked familiar.
The only case cited in support by Mr. McFadden, Knese, is not applicable. Knese held defense counsel were ineffective for failing to read jury questionnaires from *305 which they would have learned two jurors' responses "suggest-although not conclusively establishing-that they would automatically vote to impose death after a murder conviction." Id. at 633 . This Court held, "At a minimum, counsel should have read the questionnaires, and voir dired to determine whether they could serve as jurors. Failure to do so is ineffective assistance of counsel." Id.
The key difference here is defense counsel had no similar indication Juror Williams was on the prior venire panel based on Juror Williams' questionnaire or voir dire responses, or based on Mr. McFadden's assertion he thought Juror Williams looked "familiar." As Mr. McFadden had no idea why Juror Williams looked familiar, once Juror Williams did not respond affirmatively to the court's question whether anyone recognized Mr. McFadden, defense counsel could have done no more than re-ask the same question the circuit court had already asked. No case suggests failing to repeat the court's voir dire questions to see if the response might have changed is error.
Even if counsel were ineffective in failing to ask Juror Williams a specific follow-up question, their failure could not have been prejudicial. At the postconviction hearing, Juror Williams again, and repeatedly, testified he still simply did not remember Mr. McFadden. Defense counsel could not have created a memory when none existed. "Although the Constitution guarantees the right to competent counsel, we cannot expect counsel to be omniscient or clairvoyant." Redus v. Swenson, 468 F.2d 606, 607 (8th Cir. 1972).[5] The motion court did not clearly err in finding defense counsel were not ineffective for failing to act on inadequate information.
B. Failure to Adequately Impeach Eva's Testimony
Mr. McFadden next alleges the motion court clearly erred in finding defense counsel were not ineffective in the guilt phase for failing to call several additional lay witnesses and failing to present photographs and measurements of the crime scene at trial to impeach Eva's testimony that she saw Mr. McFadden kill her sister. He notes Eva was the key witness for the State and, had she been further impeached, it would have undermined her credibility, and he would not have been convicted.
To prevail on a claim of ineffective assistance of counsel for failure to call a witness, the defendant must show: "(1) counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." Deck v. State, 381 S.W.3d 339, 346 (Mo. banc 2012) (citation omitted). In this case, the only issue is whether the uncalled witnesses' testimony would have provided Mr. McFadden a viable defense by impeaching Eva's testimony.
"Ordinarily, the failure to call a witness will not support an ineffective assistance of counsel claim because the choice of witnesses is presumptively a matter of trial strategy." Tisius v. State, 519 S.W.3d 413, 427 (Mo. banc 2017) . This presumption applies to counsel's decision not to impeach a witness.
*306 Barton, 432 S.W.3d at 750 . "A trial strategy decision may only serve as a basis for ineffective counsel if the decision is unreasonable." McLaughlin v. State, 378 S.W.3d 328, 337 (Mo. banc 2012) (citation omitted). The defendant "has the burden of showing that the impeachment would have provided [him] with a defense or would have changed the outcome at trial." State v. Phillips, 940 S.W.2d 512, 524 (Mo. banc 1997) . "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690 , 104 S.Ct. 2052.
Counsel can be found ineffective for failing to impeach witnesses with their prior inconsistent statements about the circumstances surrounding a crime when the defendant's mental state "was the key issue in contention between the parties" and the prior inconsistent statements "related directly to the central issue of whether [the defendant] acted with deliberation or in a fit of rage or out of self-defense." Black v. State, 151 S.W.3d 49, 56 (Mo. banc 2004) . In such circumstances, there is a reasonable probability this would have affected the outcome of the trial because, if believed, their testimony would have negated an element of the crime for which the defendant was convicted. Id. at 58 .
Unlike in Black , Mr. McFadden fails to identify prior inconsistent statements Eva made and with which she could have been impeached, nor would the impeaching testimony of the uncalled witnesses have related "directly to the central issue." Rather, and again unlike in Black , counsel made a strategic decision to not call additional lay witnesses after weighing their impeachment value against the damaging cross-examination to which they would have been subjected.
1. Failure to call Ms. Jones as a witness
If called, Ms. Jones, Eva's friend and the owner of the house on Blakemore where Mr. McFadden confronted Eva, would have testified she did not hear Eva and Mr. McFadden fighting and Eva did not tell her they had been in an argument the night of Leslie's murder. The defense argues this would have impeached Eva's claim that she fought with Mr. McFadden outside the house the night Leslie was murdered.
Defense counsel testified they made the strategic decision not to call Ms. Jones at this trial because the fight issue was not a central one. Further, Ms. Jones' testimony was only minimally helpful because she admitted she was in her bedroom the entire evening watching television. The only bedroom window was on the side of the house, not the front where the fight occurred, and the window was closed and the storm window was in place.
Further, Ms. Jones could have been used by the prosecutor to bolster other aspects of Eva's testimony. She testified that the night Leslie was murdered she spoke with a very emotional Eva, who told her she had seen Mr. McFadden shoot Leslie multiple times. Ms. Jones testified she walked with Eva to the murder scene, and Eva told Ms. Jones she saw the murder while hiding in the bushes. This testimony would have corroborated Eva's testimony about the shooting and would have undercut Mr. McFadden's defense.
As defense counsel stated at the postconviction hearing, this was one more instance in which "if we thought that it didn't work or didn't go well in the first trial, we didn't do it again in the second trial." "Ordinarily, the failure to call a witness will not support an ineffective assistance of counsel claim because the choice of witnesses is presumptively a matter *307 of trial strategy." Tisius, 519 S.W.3d at 427 .
2. Failure to call Mr. Jackson as a witness
Mr. McFadden also contends defense counsel were ineffective in failing to call Mr. McFadden's friend, Mr. Jackson. At a deposition taken for the postconviction hearing, Mr. Jackson testified Eva was inaccurate in testifying that, earlier in the day of the murder, Mr. McFadden slapped Eva, pointed a gun at Leslie, and got out of his friend's car after following it from the house on Blakemore. But defense counsel testified Mr. Jackson told them a different story when they interviewed him by telephone prior to the second trial for murdering Leslie; he said he remembered driving down the street the night of the murder but did not see or remember anything specific. Further, Mr. Jackson would have been especially vulnerable to impeachment based on his lengthy criminal record-including murder-and his admission he tried to get Mr. McFadden to leave the house after fighting with Leslie and Eva because Mr. McFadden was wanted for Mr. Franklin's murder. The motion court did not clearly err in finding defense counsel used a reasonable trial strategy. Strickland, 466 U.S. at 690 , 104 S.Ct. 2052.
3. Failure to call Margaret Walsh as a witness
Margaret Walsh is the technician who performed blood analysis testing on the clothing Mr. McFadden was wearing when he was arrested. Mr. McFadden claims Ms. Walsh's failure to find blood on his clothes, even though Leslie was shot at close range, was exculpatory. But Mr. McFadden was not arrested until two days after the shooting. Defense counsel testified at the postconviction hearing that, in weighing the minimal impeachment value against the risk of cross-examination by the State, they decided against calling her as a witness. The motion court did not clearly err in finding defense counsel used a reasonable trial strategy in not calling Ms. Walsh absent a showing Mr. McFadden was wearing the same clothes at the time of shooting or had not washed them.
4. Failure to present evidence of lighting and distance
Lastly, Mr. McFadden alleges defense counsel were ineffective in failing to present photographs the defense had taken of area lighting and distance measurements between where Eva reported she was standing and the location where the shooting occurred. Eva testified she hid in the bushes and saw Mr. McFadden shoot Leslie. Mr. Stevenson testified he saw Leslie walk down Naylor toward the murder scene, saw a man come up and argue with her, saw the man follow her around the corner, and then heard continued arguing and gunshots. Upon hearing the gunshots, Mr. Stevenson immediately went outside, ran toward Leslie's body, and called 911. The State also presented testimony from Eva regarding the lighting and distances around the crime scene. Defense counsel cross-examined both Eva and Mr. Stevenson about the lack of a street light on the side of Kienlen where Leslie's body was found, cross-examined Eva about whether she really could see the murder from the bushes, and brought out that Mr. Stevenson could not really see the body until a car drove up and shined its headlights on the area.
Officer Hunnius, a crime scene investigator, took pictures of the scene the night of the murder and also made a diagram of the distance measurements. He testified the area was lit by four dusk-to-dawn street lamps that gave off more light than they appeared to give out in photographs, *308 that would have illuminated the area where Eva said she saw Mr. McFadden get out of the car, and that provided enough light for someone hiding in the bushes to see someone walking up Naylor. On cross-examination, defense counsel elicited testimony the streetlight on Naylor did not illuminate the area near Kienlen and the distance between where Eva hid and where Leslie was shot was approximately 150 to 200 feet.
Mr. McFadden now argues his counsel should have introduced its own photographs and measurements to further undercut and impeach Eva's claim she could see the murder from the bushes. In support, at the postconviction hearing, Mr. McFadden presented deposition testimony of an investigator who took photographs of the area and concluded the lighting was bad and a witness could not have seen much. The motion court found this testimony not credible and of little value because it was taken 10 years after the murder, during the daytime. The investigator was also unable to testify the lighting and other aspects of the scene had not changed. The testimony had little, if any, probative value.
Defense counsel also testified at the postconviction hearing that they considered presenting their own photographic evidence but determined it would not be helpful. When the defense team visited the scene with investigators during the day, they found it possible Eva could have seen the murder from her location behind the bushes. The investigator who visited at night did not report that Eva would have had trouble seeing the shooting. Further, none of this evidence would have impeached Eva's statement that she recognized Mr. McFadden's voice when he was yelling at Leslie just before the shooting. Defense counsel, therefore, chose to cast doubt on Eva's ability to see the murder scene by cross-examining her and the State's other witnesses regarding the lighting at the murder scene and the distance from the bushes to the murder scene. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible opinions are virtually unchallengeable." Strickland, 466 U.S. at 690 , 104 S.Ct. 2052. The motion court did not clearly err in determining it was a reasonable strategy. McLaughlin, 378 S.W.3d at 337 .
V. FAILURE TO CALL ADDITIONAL LAY AND EXPERT MITIGATION WITNESSES IN PENALTY PHASE
A. Law Governing Duties of Counsel in Presenting Penalty Phase Mitigation
Mr. McFadden argues the motion court clearly erred in rejecting his claim defense counsel were ineffective for failing to call lay witnesses Lisa Thomas, Tanesia Clark, Elwyn Walls, Sean Nichols, and Willibea Blackburn, and for failing to call expert witnesses Dr. White, Dr. Draper, and Dr. Gelbort during the penalty phase. "Because Movant is challenging counsel's failure to call certain witnesses during the penalty phase, a 'viable defense' is one in which there is a reasonable probability that the additional mitigating evidence those witnesses would have provided would have outweighed the aggravating evidence presented by the prosecutor resulting in the jury voting against the death penalty." Deck, 381 S.W.3d at 346 .
"In a death penalty case, trial counsel has an obligation to investigate and discover all reasonably available mitigating evidence," Davis v. State, 486 S.W.3d 898, 906 (Mo. banc 2016) , including, "medical history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences."
*309 Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (emphasis omitted). But the " 'duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.' " Strong, 263 S.W.3d at 652, quoting, Rompilla v. Beard, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). "In the real world containing real limitations of time and human resources, criminal defense counsel is given a heavy measure of deference in deciding what witnesses and evidence are worthy of pursuit." Twenter, 818 S.W.2d at 635 (citation omitted). Counsel "will not be found ineffective for choosing to pursue one reasonable trial strategy to the exclusion of another." Davis, 486 S.W.3d at 912 (citation omitted).
At the postconviction hearing, defense counsel testified that, before deciding their mitigation defense, they conducted a thorough investigation of Mr. McFadden's childhood, development, criminal background, and environment by talking with his family and friends and by having Dr. Draper review this information. They also assessed the strength of each of the witnesses' testimony at Mr. McFadden's previous trials. Because of the weakness of prior expert testimony about mitigation issues, defense counsel made a strategic decision to build their mitigation defense using six lay witnesses who had done well on both direct and cross-examination at Mr. McFadden's previous trials. The testimony of each of these lay witnesses centered around defense counsel's theme for mitigation-that Mr. McFadden grew up in a violent neighborhood, lacked guidance growing up, and had a chaotic childhood in which he did not have consistent parenting and was shuffled around from home to home. Defense counsel did not believe it would be helpful to call the additional lay witnesses, as each had serious weaknesses or was duplicative. Counsel further decided not to again call expert mitigation witnesses who previously had been ineffective and were subject to serious impeachment and whose testimony risked overshadowing the message they wanted to present through lay witnesses.
B. Lay Witnesses Who Testified to Mr. McFadden's Upbringing in Pine Lawn
During the penalty phase, defense counsel first called Elaine Hood, who knew Mr. McFadden because he was friends with her daughters when they were younger. As he got older, Mr. McFadden babysat Ms. Hood's grandsons four or five times per week. When she and Mr. McFadden saw each other, which was "just about every day," they would talk about church, jobs, and staying out of trouble. Ms. Hood enjoyed being around Mr. McFadden. She also testified regarding the culture of Pine Lawn, saying it was a "rough" neighborhood because of all the shootings, which were terrifying and the main reason she moved. Even though violence and drugs were rampant in Pine Lawn, she testified on cross-examination she knew good people who lived in the community.
Counsel also brought in family members to discuss Mr. McFadden's upbringing. Mr. McFadden's aunt testified regarding his childhood. She recalled his father was a severe alcoholic and his mother worked two jobs to support the family, often leaving Mr. McFadden and his sisters home alone. The siblings ended up staying with their aunt frequently, and she always made sure he attended sports or other activities and supported him during those activities. She believed she was a good role model for the children. Finally, Mr. McFadden's aunt also recounted he was *310 small for his size and picked on regularly but was never beaten or sexually abused.
Another of Mr. McFadden's aunts also testified, as did her husband, a church minister.[6] She and her husband got Mr. McFadden involved in church. They treated him as their son and participated in fun activities with him. Mr. McFadden was small for his age and when other kids bullied him, his uncle would intervene. When he was a teenager, Mr. McFadden requested to live with them permanently. Had he done so, they would have intervened to prevent him from taking part in inappropriate activities, but unfortunately, Mr. McFadden's mother would not allow him to live with them permanently.
Mr. McFadden's grandmother similarly discussed his upbringing, describing that Mr. McFadden's mother was often absent and his father suffered from alcoholism, though he was never aggressive, violent, or in prison. Mr. McFadden stayed with his grandmother often, sometimes for extended periods of time. His grandmother and grandfather were good to Mr. McFadden and provided him with a good home.
Finally, Mr. McFadden's father testified. He said, because he was an alcoholic, he would often promise to do things with Mr. McFadden but then never show up, which often left his son disappointed. His father did not believe he was good to Mr. McFadden, but he always made sure his children had something to eat. On cross-examination, Mr. McFadden's father discussed Mr. McFadden's time at Tarkio Academy, an alternative school, and admitted it was likely his son's fighting behavior that placed him there. He further testified he was unsure whether his son was the one being bullied or the one bullying others but knew his son got into fights often and had visible bruises and injuries.
C. Decision Not to Call Additional Lay Witnesses
Mr. McFadden now claims defense counsel also should have called Sean Nichols and Elwyn Walls to testify regarding the terrible social conditions of those living in Pine Lawn, as they did at the evidentiary hearing. But Ms. Hood already testified about these conditions, and unlike Ms. Hood, these two witnesses did not know Mr. McFadden personally and would have been able to testify only about the general social conditions of Pine Lawn. Testimony regarding the particular circumstances surrounding Mr. McFadden's life and his crimes would only have been speculation. Further, putting these two witnesses on the stand would have opened the door to especially damaging cross-examination regarding Mr. McFadden's other crimes and the fact Mr. McFadden was a member, not a victim, of the gangs responsible for much of the violence in Pine Lawn. Counsel instead chose a strategy throughout the penalty phase of keeping out evidence of gang and drug activity. The motion court did not clearly err in concluding the risk of negative testimony from these two witnesses outweighed any mitigation value.
The other four lay witnesses Mr. McFadden says defense counsel should have called testified either in-person or by deposition at the postconviction hearing regarding their positive interactions with Mr. McFadden and how the culture in Pine Lawn consists of gangs, drugs, violence, and poverty. This testimony would have been cumulative to the testimony already presented by Ms. Hood and Mr. McFadden's family members. "Counsel is not ineffective for not presenting cumulative evidence." Deck, 381 S.W.3d at 351 (citation omitted). This is *311 particularly true when, as here, the witnesses' testimony would have been subject to damaging cross-examination about the fact Mr. McFadden and his gang were responsible for a substantial part of the violence creating that dysfunctional social culture. Such evidence would have been aggravating, rather than mitigating, and the motion court did not clearly err in concluding defense counsel were not ineffective in failing to call these witnesses, whose testimony would have detracted from counsel's efforts to keep out evidence of gang activity. McLaughlin, 378 S.W.3d at 337 ; Davis, 486 S.W.3d at 912 .
D. Failure to Call Additional Experts in Penalty Phase
1. Failure to call Dr. White to testify about cultural milieu
Mr. McFadden argues the motion court clearly erred in rejecting his claim defense counsel were ineffective in failing to call Dr. Norman White to testify during the penalty phase regarding the cultural milieu of Pine Lawn. Dr. White's research focuses on determining what factors cause young people to become involved in crime. Postconviction counsel retained Dr. White to create a "social profile" regarding what life was like growing up in Pine Lawn. Dr. White interviewed multiple individuals who lived there and interviewed Mr. McFadden on four separate occasions. He also spoke with others who worked in youth services in nearby areas when Mr. McFadden was growing up. He concluded the lack of education and poverty, and the fact the area was rife with teen pregnancy, was predictive of high crime rates for young African-American males. He believed these factors also were the likely result of Pine Lawn's high level of gang activity.
Much of the evidence Dr. White presented regarding the cultural milieu of Pine Lawn was not available in 2008. Defense counsel also testified they were unaware of the use of such sociological testimony in capital cases in 2008; at the time, it would have been normal to present evidence of the culture surrounding Pine Lawn through lay witnesses, as counsel did here. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's performance at the time." Strickland, 466 U.S. at 689 , 104 S.Ct. 2052.
In any event, counsel explained they had considered calling a gang expert but strategically decided an expert on the issue would likely have been more harmful than helpful as it could have brought attention to Mr. McFadden's gang involvement, an issue defense counsel specifically wanted to minimize at trial. Dr. White's testimony similarly would have been subject to cross-examination about Mr. McFadden's gang involvement and could have exposed the jury to damaging evidence about Mr. McFadden's drug dealing and other crimes in which he was the prime suspect. Finally, Dr. White never discussed the facts of Mr. McFadden's offenses or related them to the conditions in which he grew up and was unable to render an opinion regarding the impact of growing up in Pine Lawn on Mr. McFadden's choice to murder Leslie. As his testimony was of limited assistance, the motion court did not err in concluding counsel were not ineffective in failing to call him as a witness.
2. Failure to call Dr. Draper to testify regarding childhood
Mr. McFadden also argues defense counsel were ineffective in failing to call Dr. Draper, whom they utilized as an expert during the penalty phase of both trials involving the murder of Mr. Franklin *312 and the first trial involving the murder of Leslie. Dr. Draper testified at the postconviction hearing that Mr. McFadden suffered from an attachment disorder that arose in reaction to the insufficient structure and bullying of his childhood.
Defense counsel testified that while Dr. Draper's opinions were helpful, their usefulness was outweighed by her weakness as a witness. In all three penalty phases in which she testified and at the postconviction hearing, Dr. Draper gave damaging opinions that Mr. McFadden knew the difference between right and wrong, his attachment disorder did not make him a murderer, and he used his free will to choose to murder. Moreover, Dr. Draper had "testified really badly in the third trial"-that is, in Mr. McFadden's second penalty phase trial for Mr. Franklin's murder, including revealing Mr. McFadden had threatened his mother with a shotgun. She further was badly impeached in that trial, which made "it just look as if she just says whatever [defendants] want, if it helps them."
Baumruk v. State, 364 S.W.3d 518, 536 (Mo. banc 2012) , found no clear error in choosing not to present expert testimony regarding movant's brain limitation when it "had been presented in Baumruk's first trial to no avail and, therefore, it was a reasonable strategic decision for Baumruk's counsel to present different mitigating evidence during Baumruk's second trial." Similarly here, it was not clear error for the motion court to find defense counsel made a reasonable strategic decision not to call Dr. Draper and instead to rely on lay witnesses who performed better in front of the jury. This decision was not based on inadequate investigation or unreasonable trial strategy but due to concerns Dr. Draper's previous damaging cross-examinations would be used to impeach her in this trial.[7] Counsel "will not be found ineffective for choosing to pursue one reasonable trial strategy to the exclusion of another." Davis, 486 S.W.3d at 912 .
3. Failure to call Dr. Gelbort to testify regarding mental capacity
Similarly, the motion court did not clearly err in finding defense counsel were not ineffective for failing to call Dr. Gelbort as a neurological expert to testify Mr. McFadden's mental capacity was that of someone under the age of 18. To the extent Mr. McFadden argues a mental age of less than 18 entitles him to be treated as a juvenile for sentencing purposes and precludes imposition of the death penalty even though he was 23 at the time he committed the murder, this Court already has rejected that argument in Tisius, 519 S.W.3d at 430-31 . Tisius held that even though the United States Supreme Court "recognized the potential for a defendant's mental age to differ from his or her biological age," it *313 "nonetheless, implemented a bright line rule as to the minority age for imposition of the death penalty" and "trial counsel were not ineffective for failing to object on grounds that Mr. Tisius' mental age prohibited imposition of the death penalty" because his biological age was over 18. Id. at 431 . While it may be, at some future time, courts will prohibit imposition of the death penalty for those younger than 25 years, this is not currently the law.[8]
To the extent Mr. McFadden is arguing counsel were unreasonable in deciding not to call Dr. Gelbort as a neurological expert in mitigation, his claim also fails. The record shows counsel's decision was based on their specific familiarity with Dr. Gelbort and their belief calling him would have hurt Mr. McFadden's case. In 2004, he was hired by counsel to perform a neuropsychological exam on Mr. McFadden. He concluded Mr. McFadden had a full-scale IQ in the low-average range, had impulse control problems, and had impairments in the areas of the brain that give rise to decisionmaking. But he also would not characterize Mr. McFadden as mentally disabled and believed Mr. McFadden's mental capacity did not absolve him of responsibility for the murders of Leslie and Mr. Franklin.
Defense counsel nonetheless called Dr. Gelbort to testify during the first trial involving the murder of Leslie and the first trial involving the murder of Mr. Franklin, but he performed poorly on cross-examination. Counsel believed Dr. Gelbort's previous testimony was not particularly helpful because he could not definitively say Mr. McFadden's cognitive functioning had any impact on the decision to kill Leslie, the testimony had not been well-received by the jury because Dr. Gelbort had an "attitude" on the stand, and in both cases, the jury recommended death. Because of Dr. Gelbort's previous poor performance, defense counsel chose to try a new strategy in the retrial by calling only lay witnesses. Such "strategic choices made after thorough investigation of law and facts relevant to plausible opinions are virtually unchallengeable." Strickland, 466 U.S. at 690 , 104 S.Ct. 2052. The motion court did not clearly err in failing to find defense counsel ineffective for failing to repeat strategies that did not work at the prior trials, Baumruk, 364 S.W.3d at 536 , and instead "choosing to pursue one reasonable trial strategy to the exclusion of another." Davis, 486 S.W.3d at 912 .[9]
VI. ADDITIONAL PENALTY PHASE CLAIMS
A. Failure to Conduct a PET Scan
Mr. McFadden also argues the motion court clearly erred in failing to find defense counsel were ineffective for not sending him to have a PET (positron emission tomography ) scan of his brain in 2003 and for failing to call Dr. Gur, a clinical psychologist and professor, to testify about the scan's results.[10] But defense counsel *314 testified at the postconviction hearing that when preparing for trial they were unaware of any experts who forensically interpreted PET scans, and they knew Washington University in St. Louis refused to analyze scans for use in criminal cases. While Mr. McFadden put on contrary evidence, this Court "defers to the motion court's superior opportunity to judge the credibility of witnesses." Barton, 432 S.W.3d at 760 .
Even if they identified a place to have a PET scan performed, counsel testified at the postconviction hearing they did not want the exam because, "If we could have done [the PET scan ] without the State automatically getting the results, I'm sure we would have done it." But counsel believed the State would have seen the results and were worried because:
... if you do a scan and it shows it's-there is no structural damage or the scan doesn't show any damage, the neuro psych testing can still be valid, but it makes it very easy for the prosecutor to argue that, it's just mumbo-jumbo. You should just not pay attention to that neuro psych testing because here we have a picture of his brain and it's fine, so we [defense counsel] tended to proceeded cautiously with imaging for that reason.
Forrest v. State, 290 S.W.3d 704, 709 (Mo. banc 2009) , held counsel was not ineffective for failing to obtain a PET scan based on similar fears "an ex parte order would not be granted and the results might have undermined the mitigating evidence."
Against these risks counsel balanced what they believed to be minimal potential benefit from PET scan evidence because it would show only structural problems, and, as this Court noted in Zink, for this reason "the mitigating value of the PET scan evidence is limited because ... there is no generally accepted scientific link between [a movant's] brain abnormalities and his diagnosed personality disorders." 278 S.W.3d at 182 . The reasonableness of counsel's belief in the limited value of a PET scan became evident during Dr. Gur's postconviction testimony. He said that when he performed a PET scan in 2012, some 12 years after the murder, he found abnormalities that might have resulted in Mr. McFadden misinterpreting danger signals and being unable to exercise impulse control. But Dr. Gur acknowledged brain imaging results have limited application in determining intent, neither he nor Dr. Preston interviewed Mr. McFadden and could not directly link any of his abnormalities to his crimes, experts should avoid drawing conclusions about specific behaviors based on imagining data alone, and he could not definitely say Mr. McFadden's PET scan results would have been the same at the time of the murder or even at the time of trial. Moreover, on cross-examination Dr. Gur testified Mr. McFadden's actions before and after the murder reflected planning, exercise of judgment, and an intent to kill.
"Counsel has limited time and resources, and if there is a strategy that does not look promising, he may 'cho[o]se not to expend his limited resources to that end.' " Zink, 278 S.W.3d at 182, citing, State v. Brown, 902 S.W.2d 278, 298 (Mo. banc 1995) (alteration in original). Here, defense counsel strategically decided not to get a PET scan with full knowledge of the possible results, and the motion court did not *315 commit clear error in finding it to be reasonable. McLaughlin, 378 S.W.3d at 337 .
B. Failure to Object to Introduction of Prior Convictions
Next, Mr. McFadden asserts the motion court clearly erred in finding defense counsel were not ineffective for failing to object to certain portions of certified copies of two criminal convictions admitted into evidence and provided to the jury. These exhibits included Mr. McFadden's guilty plea to felony possession of cocaine base and unlawful use of a weapon and his guilty plea to a misdemeanor charge of third-degree assault. Mr. McFadden concedes it was not error to admit evidence of these prior convictions, see State v. Ervin, 835 S.W.2d 905, 925 (Mo. 1992) , but contends effective counsel would have objected to admitting the portion of the exhibit mentioning the pistol he was charged with unlawfully carrying was loaded with live rounds. He also alleges counsel were ineffective in allowing admission of the portion of the exhibit showing he was certified as an adult because of the seriousness of the offense, which originally had been charged as a felony rather than the misdemeanor to which he pleaded guilty. Counsel testified they strategically chose not to object to these exhibits because, in the absence of these certified copies of prior convictions, the State may have been permitted to prove the prior convictions with live witnesses. Counsel concluded the brief mention of these facts in the dry paper evidence was so minimally prejudicial it was outweighed by the risk of allowing witnesses to testify about these crimes. The motion court found this reasonable.
Moreover, to be entitled to relief, Mr. McFadden would have had to show there is a reasonable probability, had counsel objected to the failure to redact these exhibits, he would not have received a death sentence. Strickland, 466 U.S. at 695 , 104 S.Ct. 2052. He has not met this burden. The properly admitted evidence showed Mr. McFadden was certified as an adult and the jury knew pistols usually are loaded. He also had prior convictions for first-degree murder, armed criminal action, and assault, and there was substantial testimony about his reputation for violence. There is no reasonable likelihood the minimal prejudice from introduction of the exhibits would have affected the sentence.
C. Failure to Rebut Prior Assault Convictions
Mr. McFadden admits the circuit court did not err in admitting certified records showing he was convicted of two counts each of first-degree assault and armed criminal action for attacking Daryl Bryant and Jermaine Burns. But he alleges counsel were ineffective in their cross-examination of a State's witness as to how the assaults occurred and in failing to offer rebuttal evidence. In particular, Shonte Addison testified she saw Mr. McFadden threaten the victims with a gun and saw one victim "had a big hole in his side, a lot of blood, and I dragged him in the hospital." On cross-examination, counsel got Shonte to admit she did not witness the shooting and did not know who fired the first shot.
Mr. McFadden now argues defense counsel should have offered rebuttal evidence that the crime did not occur as Shonte claimed and that the injury to the victim's side was not nearly as bad as she testified. But there was no question the wound was substantial and required hospital treatment; whether the witness exaggerated its size was of minimal probative value. Further, the motion court found the investigator who Mr. McFadden said should have been called was not certified in ballistics or in crime scene interpretation and has never qualified as an expert *316 witness in Missouri. The motion court did not find his alternative version of the facts credible. This Court "defers to the motion court's superior opportunity to judge the credibility of witnesses." Barton, 432 S.W.3d at 760 .
Even were the testimony sufficiently credible, counsel testified as a matter of strategy they wanted to limit evidence of the prior assault convictions. The State could have put on even more prejudicial and inflammatory evidence supporting the convictions. The motion court did not clearly err in finding defense counsel were reasonable in not highlighting these convictions.[11] McLaughlin, 378 S.W.3d at 337 .
D. Failure to Object to Prosecutor's Closing Arguments
Lastly, Mr. McFadden argues the motion court clearly erred by failing to find defense counsel were ineffective for not objecting to two statements made by the prosecutor during closing argument. The prosecutor stated:
Ladies and gentlemen, I leave you with Leslie and Todd. Hold them. Hug them. Tell them you love them. But most of all, don't let them down. This verdict is for Leslie and Todd.
The prosecutor also stated:
And on that day that [Mr. McFadden] killed Todd, on the following May, there was one juror in Pine Lawn. That juror was the foreperson. Had no instructions of law. There was no trial. There were no jury instructions. There was no evidence. There were no witnesses.
And that foreperson and that juror decided that the death penalty was appropriate then and that Todd and Leslie should not get a fair trial. Because if there's one person in this courtroom that believes in the death penalty, it's that man right there.
Mr. McFadden did not object to these arguments but argued they were plain error on direct appeal. This Court held that while the first statement was "emotionally charged," so were "the facts of this case," McFadden, 391 S.W.3d at 425 , and "[a]rguments likely to inflame and excite prejudices of the jury are not improper if they help the jury understand and appreciate evidence that is likely to cause an emotional response." Id. at 425-26 (citations and quotations omitted). This Court similarly found no plain error in the second statement, noting, "Even though vividly framed, the argument was not erroneous because it assisted the jury in understanding both the evidence and legal process in this case." Id. at 425. Therefore, the circuit court "did not plainly err in allowing this argument." Id. at 426 .
Mr. McFadden now argues there is a reasonable probability counsel's failure to object to these two statements during trial affected the verdict and requires a new trial under Strickland , citing, Deck v. State, 68 S.W.3d 418 (Mo. banc 2002). Deck did recognize that when the appellate court finds error occurred, but affirms because it did not rise to the level of plain error, "denial of a plain error claim on direct appeal is not dispositive of the question whether counsel was ineffective in failing to preserve the issue as to which plain error was not found." Id. at 428. Deck does not apply when, as here, the appeal concluded there was no error, plain or otherwise, because the prosecutor's closing arguments helped "the jury understand and appreciate evidence that is likely to cause an emotional response" and "assisted the jury in understanding both the evidence and legal process in this case."
*317 McFadden, 391 S.W.3d at 425-26 ; see Ringo v. State, 120 S.W.3d 743 (Mo. banc 2003). "The failure to make meritless objections does not constitute ineffective assistance of counsel." Tisius, 519 S.W.3d at 429 . The motion court did not commit clear error by finding counsel were not ineffective for failing to object to an argument not in error.
VII. CONCLUSION
The motion court's findings of fact and conclusions of law are not clearly erroneous. Its judgment denying Mr. McFadden postconviction relief is affirmed.
All concur.

To avoid confusion, the Addison sisters will hereafter be referred to by their first names. No disrespect or undue familiarity is intended.

"The facts are viewed in the light most favorable to the verdict and judgment." Ervin v. State, 80 S.W.3d 817, 821 n.1 (Mo. banc 2002) (citation omitted).

A jury found Mr. McFadden guilty of first-degree murder and armed criminal action and the court imposed the death penalty for the murder of Mr. Franklin. Those convictions were reversed and remanded due to a valid Batson challenge. Id. On remand, Mr. McFadden again was convicted and received a death sentence. This Court affirmed that conviction and sentence in State v. McFadden, 369 S.W.3d 727 (Mo. banc 2012) .

While Judge Goldman did say he found the two jurors' testimony credible, neither Judge Dolan's nor Judge DePriest's orders relied on any findings or conclusions of Judge Goldman. Judge Dolan's order denying Mr. McFadden's request to question all petit jurors does not mention Judge Goldman at all. After reviewing the record, she found no need to question other jurors because the record reflected Juror Williams did not recall Mr. McFadden. Judge DePriest's findings mentioned, when discussing the history of the case, that Judge Goldman found Juror Williams and the other juror credible, but Judge DePriest's analysis did not rely on these findings. Instead, he relied on the transcript.

Mr. McFadden also notes, after trial, his appellate counsel thought to check lists of venire panels for Mr. McFadden's prior trials and found Juror Williams listed as a venire member who had not been chosen. But the issue is whether trial counsel were ineffective, not whether they might have discovered additional information had counsel thought to employ the same creative discovery methods later contemplated by appellate counsel.

The husband's previous testimony was read to the jury because he died prior to trial.

In fact, the record reveals Mr. McFadden agreed it was best not to call Dr. Draper, as he too did not like the things Dr. Draper had to say about him. To the extent he argues the defense could have called a "similarly qualified expert" in lieu of Dr. Draper, he does not discuss the need or ability to call another expert in his argument and the record does not identify whether another expert like Dr. Draper would have been available. He has, therefore, failed to show that a similarly qualified expert existed, would have been reasonably found, and would have testified. Deck, 381 S.W.3d at 346 . "[D]efense counsel is not obligated to shop for an expert witness who might provide more favorable testimony." Anderson, 196 S.W.3d at 37 (citation and quotations omitted). "While defense counsel could have continued to consult additional experts in the hope of finding one who might support [the] defense, counsel is not required to seek out an expert who might provide more helpful testimony." Worthington v. State, 166 S.W.3d 566, 575 (Mo. banc 2005) . "Counsel is entitled to instead pursue other reasonable defense strategies." Id.

The only case Mr. McFadden cites reaching a contrary conclusion is an intermediate appellate decision from Illinois, People v. House , 410 Ill.Dec. 971, 72 N.E.3d 357, 388 (Ill. App. 2015) . House was decided based on the Illinois constitution, however, and did not suggest Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) , required a similar result.

Although the argument section of Mr. McFadden's brief suggests counsel should have arranged a PET scan, as any abnormality would have supported Dr. Gelbort's testimony, this is not in the point relied on and is developed under a different point in relation to Dr. Gur, so this opinion discusses it in that point.

While Dr. Gur was not available to testify at the trial, he was called as a post-trial substitute for Dr. Preston, a medical doctor who was available and had previously recommended a PET scan be performed. Mr. McFadden also argues the testimony about the PET scan and Dr. Gur's testimony would have corroborated Dr. Draper's and Dr. Gelbort's testimony. For the reasons previously noted, counsel used a reasonable trial strategy in choosing not to call those two expert witnesses.

Mr. McFadden also presented this same claim and evidence in his postconviction motion in the underlying assault case. It was rejected.