

# SUPREME COURT OF MISSOURI
## en banc

JESSE DRISKILL )
)
        Appellant, )
)
v. )     No. SC98259
)
STATE OF MISSOURI )
)
        Respondent. )

*Opinion issued June 1, 2021*

### APPEAL FROM THE CIRCUIT COURT OF LACLEDE COUNTY
### The Honorable Matthew P. Hamner, Judge

Jesse D. Driskill appeals the circuit court's judgment overruling his Rule 29.15 motion for postconviction relief. He was convicted of two counts of first-degree murder, one count of first-degree burglary, one count of forcible rape, one count of forcible sodomy, and five counts of armed criminal action. Driskill was sentenced to death for each murder count. He also received a consecutive 15-year sentence for the burglary count and seven consecutive life sentences for all remaining counts. Driskill asserts the State committed multiple *Brady* violations and trial counsel provided ineffective assistance in various respects during the original proceedings. Because the circuit court's findings of fact and conclusions of law are not clearly erroneous, the judgment denying postconviction relief is affirmed.

## Background

In the light most favorable to the verdict,[1] the evidence demonstrates that, in July 2010, Driskill and Jessica Wallace were at the Prosperine River Access on the Niangua River. They did drugs and had sex. A police officer interrupted, and Driskill ran into the woods with a gun. Wallace returned home once she spoke to the police. At the same time, roughly 1.5 miles from the Prosperine River Access, J.W. and C.W. (collectively, the "victims") were celebrating their 59th wedding anniversary at their home.

When family members became concerned about the victims' whereabouts, they went to the house. The victims' car was not there. Because the doors were locked, a relative entered through a window, finding the inside of the house was smoky and smelly. The family member also saw C.W.'s feet under smoldering blankets. After the relative opened the front door, the victims' son entered the home. The two individuals found J.W.'s body under a pile of blankets and chairs. Blood had pooled around the victims' heads.

The police were called and began investigating the scene and collecting evidence. Signs of forced entry were not apparent. The area near the victims smelled of accelerant. C.W. had burn marks on the top portion of her body and wadded paper towels had been burned in her groin area. A clear fluid and blood could be seen draining from her vaginal and anal areas. The skin beneath C.W.'s eyes was blackened, and she had a wound above her right eyebrow. Aside from his shoes, J.W. was naked. A plastic bag covered his

---

[1] *McFadden v. State*, 619 S.W.3d 434, 444 & n.1 (Mo. banc 2020).

head, and a wound was visible on his face. C.W.'s purse had been dumped onto the floor. A can of gasoline was also located in the hallway. As the police investigated the home, a burning vehicle was located near Conway, Missouri, and later determined to belong to the victims.

Meanwhile, Driskill called Wallace twice, ultimately asking her to pick him up on Highway N in Conway. Wallace attempted to do so but could not locate Driskill. Seeing first responders heading toward smoke, she left the area. In Conway, Driskill went to Hannah's General Store in an unsuccessful attempt to charge his cell phone. Later, Driskill went to a Budget Inn and used the telephone. He called Jessica Cummins, who agreed to get him. During the drive, Cummins believed Driskill was mad at her. He also mumbled during the drive, stating he had "messed up" and shot someone. Cummins believed Driskill mentioned he had used some drugs. After dropping Driskill off at Codi Vause's apartment, Cummins left. Vause and Calvin Perry were in Vause's apartment when Driskill arrived.

Driskill appeared exhausted and anxious. He stated he needed help and suggested he was being chased by the authorities. Driskill also said he needed new clothes and had killed a couple of people that day. Wallace—after Driskill contacted her and stated he perpetrated a home invasion, robbery, and double homicide—drove to Vause's apartment. Driskill explained to Wallace, Perry, and Vause that he was going through a shed or garage when an elderly couple found him. Driskill brandished his gun and ordered the couple to go inside. He then asked for money but was not satisfied with the amount. Driskill proceeded to shoot J.W. and rape C.W. Driskill initially shot C.W. in

3

the head.  She survived, and, when she tried to get away, he shot her two more times.

Driskill further stated he put a plastic bag down C.W.'s throat and a pillow over her head.

He explained he attempted to clean up the evidence by burning it and using bleach.  He

also stated he stole, and later burned, the victims' vehicle.  Driskill said his shoes were

filled with blood.  Wallace went to a store after hearing Driskill's story.  A police officer

at the store noticed she was upset and approached her.  Wallace told the officer what

Driskill had told her.

Cummins later returned to Vause's apartment.  She found Driskill using the

kitchen sink to wash his shoes.  After changing his clothes, Driskill directed Vause to

dispose of them, and she placed them in a trash bag.  Driskill subsequently fell asleep on

the couch.  At that time, the other individuals relayed Driskill's story to Cummins.  They

called the police.  Shortly thereafter, the police attempted to arrest Driskill while he was

sleeping at Vause's apartment.  Driskill resisted arrest and obtained a laceration on his

head during the scuffle.  He was eventually tasered and arrested.  The officers seized the

trash bag containing Driskill's clothes and took him to the hospital for treatment.

As the police investigated the crimes, they executed a search warrant and obtained

various evidence, including Driskill's clothing, an unlabeled pill bottle, and a pack of

cigarettes.  A sexual assault kit was conducted on Driskill.  J.W.'s and C.W.'s bodies

were autopsied.  C.W. was shot once near her jawline and once above her left eye.  The

latter shot was fatal.  C.W. had a laceration from blunt trauma above her right eyebrow.

She also had injuries consistent with sexual assault, such as tears at the entrance of her

vagina and rectum.  Vaginal swabs were collected from C.W.  DNA testing eliminated

4

J.W. as a contributor and revealed a mixture from C.W. and Driskill. J.W. was shot once near his right cheek. This wound was potentially fatal. Yet the cause of death was listed as asphyxiation resulting from a wadded-up plastic bag that was found in J.W.'s throat.

At trial, Driskill was represented by Sharon Turlington and Cynthia Dryden. During the guilt phase, the State adduced the evidence described above as well as other evidence, and Driskill presented evidence from two witnesses. The jury found Driskill guilty on all counts. During the penalty phase, the State presented evidence of Driskill's prior convictions and victim impact statements from three family members. Driskill called multiple expert and lay witnesses. These individuals testified about how Driskill's mental health issues, genetic predisposition toward violence, and difficult past, including physical abuse as a child, impacted his actions. The jury recommended death sentences for each first-degree murder count. Nine statutory aggravators were found regarding C.W.'s murder, and eight statutory aggravators were found regarding J.W.'s murder. The circuit court adopted the jury's recommendation. It also imposed a consecutive, 15-year sentence for the burglary count and seven consecutive life sentences for all remaining counts. This Court affirmed the judgment of convictions on direct appeal. *See State v. Driskill*, 459 S.W.3d 412, 433 (Mo. banc 2015).

Driskill proceeded to seek postconviction relief under Rule 29.15. An evidentiary hearing was held. The case originally was assigned to a first judge, who presided over part of the hearing. After Prosecutor Jon Morris testified, however, the first judge

5

recused himself, and a second judge was appointed. The second judge heard the remaining evidence and denied postconviction relief. Driskill appeals.[2]

## Standard of Review

Review of a circuit court's judgment denying postconviction relief is "limited to a determination of whether the findings and conclusions . . . are clearly erroneous." Rule 29.15(k). Appellate courts presume the circuit court's findings are correct. *Deck v. State*, 381 S.W.3d 339, 343 (Mo. banc 2012). "A clear error is a ruling that leaves the appellate court with a definite and firm impression that a mistake has been made." *Id.* Additionally, "[t]his Court defers to 'the motion court's superior opportunity to judge the credibility of witnesses.'" *Shockley v. State*, 579 S.W.3d 881, 892 (Mo. banc 2019). The circuit court is "entitled to believe all, part, or none of the evidence presented at the post-conviction hearing." *State v. Hunter*, 840 S.W.2d 850, 863 (Mo. banc 1992).

A movant must satisfy the test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), to obtain postconviction relief based on a claim of ineffective assistance of counsel. *Anderson v. State*, 564 S.W.3d 592, 600 (Mo. banc 2018). The test requires a movant to demonstrate 1) deficient performance by counsel and 2) prejudice as a result of that deficient performance. *Strickland*, 466 U.S. at 687. Deficient performance is measured in terms of "reasonableness under prevailing professional norms." *Id.* at 688. This Court gives great deference to counsel's performance, recognizing the multitude of approaches available to defend a client, and a movant must overcome the presumption

---

[2] Because Driskill was sentenced to death, this Court has jurisdiction. Mo. Const. art. V, sec. 10.

that counsel's course of action might be considered sound strategy. *Id.* at 689. Prejudice requires a "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

"[D]ue process is violated where the prosecutor suppresses evidence favorable to the defendant that is material to either guilt or punishment." *Anderson v. State*, 196 S.W.3d 28, 36 (Mo. banc 2006) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Even without request, prosecutors must disclose exculpatory evidence, which includes material that can impeach State witnesses. *Middleton v. State*, 103 S.W.3d 726, 733 (Mo. banc 2003). "A *Brady* claim has three components: 1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; 2) the evidence must have been suppressed by the State, either willfully or inadvertently; and 3) prejudice must have ensued." *Barton v. State*, 432 S.W.3d 741, 761 (Mo. banc 2014).

## Analysis[3]

### I. Alleged Guilt Phase Errors

#### A. Failure to Disclose Purported Deal with Calvin Perry

Driskill contends the State violated *Brady* by failing to disclose an alleged deal with Perry. Specifically, he argues the State and Perry reached a tacit, unwritten

---

[3] This Court takes note of Appellant's counsel's failure to utilize normal spacing conventions for citations in the briefing. The word limits mandated by Rule 84.06(b) should not be sidestepped through such ploys.

agreement, providing that Perry's prison sentence[4] would be reduced in exchange for his trial testimony. While addressing a pretrial motion to reveal agreements, Assistant Attorney General Kevin Zoellner noted that he and Prosecutor Jon Morris had not reached any deals with witnesses. Zoellner, however, also stated the defense might want to question Perry, as Zoellner's office had received a telephone call indicating Perry would not cooperate if he was not released in time to attend an upcoming family funeral.

As evidence of an agreement, Driskill cites Perry's deposition testimony, in which Perry expressed reservations because, even though he was doing the "right thing" by testifying, he was not receiving any favors or promises. Perry went on to suggest this fact impacted his actions. Zoellner asked for Perry's trust and stated he would do whatever he could. Perry, however, was not satisfied with this answer because the parole board had already made a decision, and he believed help might come too late. In the midst of a lengthy exchange spanning roughly eight pages of transcript, Perry, while voicing his concerns, stated:

> I'm not asking for favors. I'm not asking for anything. I'm asking for at the point that I was told not to worry about doing the right thing. I'm not asking for the whole six months. I'm asking from the point I went on the abscond that this happened to the 122 days later that I was picked up.

Zoellner then replied, "Yes." Perry's trial testimony recounted Driskill's explanation of the crimes and suggested Driskill enjoyed describing details that made others

---

[4] In December 2007, Perry pleaded guilty to possessing methamphetamine and received a five-year sentence. Execution of his sentence, however, was suspended, and he was placed on probation. In February 2009, after multiple violations, Perry's probation was revoked, and the circuit court executed his five-year sentence. Perry was on parole in July 2010 when Driskill committed the murders but returned to prison before Driskill's trial.

8

uncomfortable. Perry explained he was asking the State for favors, namely being released from prison, but said he never "snitched" in exchange for favorable treatment.

During the postconviction proceedings, Morris, the prosecutor who advocated for Perry's time-credit, testified he may have interacted with Perry prior to trial, but he does not recall. Further, he did not attend Perry's pretrial deposition, although he reviewed the deposition at some point. Immediately after Perry testified, Morris spoke to Perry while leaving the courthouse. Morris knew Perry and his family, mostly from his time as a prosecutor but also personally. At that time, he learned the details of Perry's request and stated he would look into the issue after trial. Morris did not make any specific promises to Perry at that time. After the trial concluded, Morris reviewed the case, determined Perry deserved the time-credit, and took appropriate steps to ensure Perry's early release.

Because a circuit judge was not always present in Laclede County, Perry's file was taken to another county to assure the request was granted before Perry's sentence concluded. Morris also acknowledged: 1) his office typically does not assist offenders in this fashion; 2) the request was granted, even though Perry had behaved poorly on probation; 3) Morris's relationship with the Perry family played a role in his decision, as a family member had recently died and the family was experiencing difficulties; and 4) Perry was assisted more out of courtesy to Perry's mother. Perry was deposed as part of the postconviction proceedings, but he answered "no comment" to all questions besides stating his name. The circuit court found, in part, "There is some evidence from which one could infer that [] Perry had a subjective hope that his testimony might result

9

in some benefit to his legal issues. There is not, however, credible evidence of any agreement between [] Perry and the prosecution prior to trial[.]"

Under *Brady*, the State must disclose agreements with, or promises of leniency made to, its witnesses because this material is helpful impeachment evidence. *Middleton*, 103 S.W.3d at 733. Unwritten deals can also create this obligation. *See id.* "Yet, the mere fact that a witness desires or expects favorable treatment in return for his testimony is insufficient; there must be some assurance or promise from the prosecution that gives rise to a *mutual* understanding or tacit *agreement*." *Akrawi v. Booker*, 572 F.3d 252, 263 (6th Cir. 2009) (emphasis in original). Driskill believes the above facts establish the existence of an unwritten understanding. Citing Perry's deposition, Driskill relies heavily on the portion in which Perry showed frustration regarding the lack of preferential treatment and noted this was "swaying" his decisions. Zoellner's office also received a telephone call stating Perry's testimony may depend on beneficial treatment. According to Driskill, this shows Perry's willingness to testify was wavering. During the deposition, however, Perry stated "I want to do the right thing. . . . And I'm going to irregardless [sic]." While Perry was disgruntled, he was willing to testify in the absence of a deal.

Driskill points to Zoellner's "[y]es" response, which occurred after Perry detailed what he hoped to gain from testifying. Yet this seemed to signify an understanding of what Perry hoped to receive, rather than acknowledgment that a deal existed. Zoellner repeatedly emphasized he could not make any specific promises. Instead, he stated he would do what he could and Perry would have to trust him. A single "[y]es" amidst an eight-page discussion cannot establish the existence of mutual understanding or a tacit

10

agreement, especially when many other portions of the deposition directly rebut that implication.

Driskill asserts an adverse inference should be drawn from Perry's unwillingness to answer questions at his postconviction deposition. "[A] trial judge may draw an adverse inference from a litigant's assertion of the Fifth Amendment privilege in a civil case." *State v. Spilton*, 315 S.W.3d 350, 356 n.8 (Mo. banc 2010). The use of "may," though, indicates courts are not required to draw adverse inferences in this scenario. *See Allen v. Bryers*, 512 S.W.3d 17, 36 (Mo. banc 2016) ("[T]he fact-finder in a civil case is *permitted* to draw an adverse inference from a defendant's assertion of his or her Fifth Amendment right to remain silent[.]" (emphasis added)). Such an inference is inappropriate here. In his postconviction deposition, Perry stated his name for the record, but he answered "no comment" to every other question, which covered various topics such as why Perry was participating in this deposition, where he currently lives, and his criminal record. Additionally, at the evidentiary hearing, Morris explained he had spoken with Perry either before or after the postconviction deposition, and Perry indicated he did not want to answer any questions. Perry was simply an uncooperative witness.

Driskill focuses on Morris's prior relationship with Perry as well as his family and the unusual nature of this assistance. But none of these facts establish the existence of mutual understanding or a tacit agreement. Zoellner and Morris continually maintained they never made a deal with Perry. Rather, they explained to Perry that they would do what they could, while making no promises. In fact, even when speaking with Perry after he had testified, Morris merely stated he would look into the matter after trial. These

11

factors may have impacted Morris's ultimate decision to advocate on behalf of a time-credit, but they fail to show mutual understanding or a tacit agreement.

Driskill relies on the fact that Perry actually received a time-credit. The existence of preferential treatment by a prosecutor cannot alone establish a promise of leniency was given for favorable testimony. *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003). However, "the fact that a witness actually received favorable treatment may be relevant in establishing the existence of undisclosed promises of leniency when considered with other facts . . . such as a state court's finding that the prosecutor's account was not credible." *Id.* at 165 n.6. Although, Perry ultimately received favorable treatment, the arguments raised by Driskill, as explained above, are unpersuasive and do not establish the circuit court's findings were without support in the record. The mere fact Perry received favorable treatment fails to establish a deal. As the circuit court found, the evidence may indicate Perry had a subjective hope of receiving favorable treatment, but a mutual understanding and tacit agreement has not been shown. Without a deal, Driskill was not harmed, as trial counsel and the jury knew Perry was asking for favors. Sufficient evidence supported the circuit court's determination that there was no *Brady* violation, and denying relief on this claim was not clear error.

B. *Failure to Present Evidence Cummins Did Not Notice Blood on Driskill*

Driskill argues his trial counsel were ineffective for failing to elicit Cummins's testimony that she did not notice blood on Driskill when she picked him up from the Budget Inn. Throughout trial, there was various evidence that Driskill's clothing was bloody after committing the murders. Wallace testified Driskill's shoes were "filled with

12

blood," and Cummins referenced Driskill washing his shoes at Vause's apartment. Cummins also testified Driskill changed his clothes and asked for the others to be thrown out. Moreover, forensic reports stated blood stains were apparent on Driskill's clothing. Despite this evidence, the clothes tested negative for blood, and Cummins, in her deposition, stated she did not notice any blood on Driskill when she picked him up. She also suggested the motel employee did not seem to have seen anything. According to Driskill, his trial counsel should have used this testimony to rebut the State's theory that Driskill's clothes were blood-free because he successfully washed them.

At the evidentiary hearing, trial counsel testified they made a decision not to ask Cummins about this subject, but they could not recall a specific rationale. Turlington explained trial preparation consisted of reviewing police reports as well as depositions and discussing the best way to approach each witness. She stated that, after a specific discussion, they decided not to mention the potential presence of blood on Driskill. Turlington could not remember exactly why they made this decision. She noted they did present helpful evidence of a laboratory test, which showed Driskill's clothes tested negative for blood.

Driskill believes remand—to allow the circuit court to address whether trial counsel provided ineffective assistance by failing to introduce Cummins's testimony about not noticing blood on Driskill—is appropriate, as the circuit court did not make findings of fact or conclusions of law regarding this claim.[5] Circuit courts "shall issue

---

[5] To support this argument, Driskill cites *Green v. State*, 494 S.W.3d 525 (Mo. banc 2016), in which this Court noted that, if a judgment does not dispose of all claims in a case, it is not final

13

findings of fact and conclusions of law on all issues presented[.]" Rule 29.15(j). Yet every claim need not be addressed individually. *Baumruk v. State*, 364 S.W.3d 518, 539 (Mo. banc 2012). "Instead, '[g]eneralized findings are sufficient so long as they permit the appellate court an adequate record for appellate review of movant's claims.'" *Id.* (alteration in original). In this case, the circuit court thoroughly discussed a distinct, but similar, claim—that trial counsel were ineffective for failing to impeach Cummins's testimony by showing Driskill's clothing to the jury. While addressing that claim as well as others, the circuit court provided information helpful to adjudicate the current issue. For example, the judgment provided a summary of Cummins's trial testimony about giving Driskill a ride and noted trial counsel prepared for Cummins's testimony, even though they could not recall specific decisions regarding the cross-examination.

Furthermore, even if a circuit court fails to enter findings of fact or conclusions of law on an issue, remand might not be required because there are some common-sense exceptions to the general rule. *White v. State*, 939 S.W.2d 887, 903 (Mo. banc 1997).

> [A]n appellate court will not order a useless remand to direct the motion court to enter a proper conclusion of law on an isolated issue overlooked by the motion court where it is clear that movant is entitled to no relief as a matter of law and will suffer no prejudice by being denied a remand.

---

and the appeal must be dismissed. *Id.* at 533. *Green*, however, is distinguishable. The circuit court never adjudicated claims raised in Green's *pro se* motion, as the judgment's conclusion addressed only claims contained in the amended motion. *Id.* at 530. As a result, *Green* was distinguished from a prior case that used broad language and stated the movant had not established entitlement to the relief requested in both the *pro se* and amended motions. *Id.* at 530-31. Here, the claim at issue was raised in Driskill's amended motion, and the judgment addressed all claims raised in that pleading, concluding: "Having reviewed all of the evidence in this matter, and each of the claims raised by Movant in his Amended Motion to Vacate, Movant's Motion is denied." *Green* does not bar review.

14

*Id.* This exception governs here, and review by this Court is appropriate.[6]

Driskill is not entitled to relief on this claim. Failure to recall a strategic rationale for a decision does not overcome the presumption that the decision was part of a reasonable trial strategy. *See Bullock v. State*, 238 S.W.3d 710, 715 (Mo. App. 2007). At the evidentiary hearing, Turlington testified counsel made a decision not to ask Cummins whether she saw blood on Driskill when she picked him up. Trial counsel also decided not to mention that Driskill had blood on him. Driskill has failed to overcome the presumption that trial counsel employed reasonable trial strategy.

Additionally, "[i]t is not ineffective assistance of counsel to pursue one reasonable trial strategy to the exclusion of another reasonable trial strategy." *McFadden*, 619 S.W.3d at 446 (alternation in original). On cross-examination, trial counsel focused on undermining Cummins's credibility, noting Cummins lied to the police about giving Driskill a ride until the police threatened to arrest her and suggesting she was upset with

---

[6] At multiple points in his brief, Driskill condemns the circuit court for allegedly failing to conduct an independent review before adopting the State's proposed findings. He further argues many of the circuit court's findings were erroneous and adopted without record support. "This Court has held the process by which a court adopts a party's proposed findings of fact raises no constitutional problems so long as the court actually makes the findings proposed after independent review." *Hosier v. State*, 593 S.W.3d 75, 83 n.2 (Mo. banc 2019). To be affirmed, the findings must also be supported by the evidence. *Id.* "Accordingly, adopting a proposed finding that is not supported (and, in fact, is contradicted by) the evidence wastes judicial resources and strongly demonstrates why the practice of wholesale adoption of a party's proposed findings is discouraged." *Id.*

Although the Supreme Court has also criticized this practice, *see Jefferson v. Upton,* 560 U.S. 284, 293-94 (2010), "[a] trial court judgment will be affirmed if cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or not sufficient." *Hosier*, 593 S.W.3d at 83 n.2 (alteration in original). As explained throughout this opinion, the circuit court's disposition of Driskill's claims was not clearly erroneous, so the independent review issue need not be addressed further.

15

Driskill because she wanted a relationship and he did not. Asking Cummins to testify Driskill did not have blood on him when she picked him up would run counter to this strategy because trial counsel would be asking the jury to believe Cummins's testimony about an important issue while suggesting she is not credible. Focusing on impeachment rather than sending this mixed message was reasonable.

Moreover, the testimony was relatively unhelpful. While Cummins noted she did not see any blood and suggested the individual from the motel lobby did not either, she also stated that "honestly when I picked him up, I mean, he looked wet, but I also didn't, you know, like do a search on him or anything." Presenting this testimony would not have altered the outcome of trial. The circuit court did not clearly err in determining trial counsel were not ineffective for failing to adduce this testimony.

### C. Alleged Destruction of a Fiber and Hairs in C.W.'s Hand

Driskill believes the State destroyed allegedly exculpatory evidence—an orange fiber and hairs stuck between C.W.'s fingers—in bad faith. An autopsy photograph showed this material in C.W.'s hand, and the autopsy report mentioned the fiber and hairs, stating the latter appeared to be of pet origin. The report noted this evidence was given to Laclede County deputies. The orange fiber and hairs, however, were never sent to the crime laboratory for testing, and the deputies did not have a record of retaining this evidence. Further, Driskill's postconviction counsel did not find the material while reviewing the evidence. All of this demonstrates the material was misplaced or lost.

According to Driskill, the fiber and hairs were exculpatory because Driskill, at the time of his arrest, had a shaved head and dark facial hair, which did not match the

16

material.  Driskill further argues the State was aware of Driskill's appearance and the discrepancy between his hair color and the material found in C.W.'s hand.  As a result, the State supposedly knew the fiber and hairs were exculpatory when they went missing, showing the evidence was destroyed in bad faith.  The fiber, hairs, and autopsy photograph were not entered into evidence at trial, and no witnesses mentioned the material.  Kimberly Hardin, an employee at the Missouri State Highway Patrol ("MSHP") Crime Laboratory, testified at trial that some dining chairs removed from the crime scene had pet hair on them.

At the postconviction evidentiary hearing, highway patrol trooper Jason Trammel, who attended C.W.'s autopsy to collect evidence, testified.  Trammel recalled taking photographs of C.W.'s hand but did not remember seizing or receiving the fiber and hairs.  He recollected seeing a piece of orange carpet on C.W.'s hand and noted Dr. Anderson, who conducted the autopsy, believed the hairs were of pet origin. Turlington testified that, while she did not remember if she saw the orange fiber and hairs when reviewing evidence for trial, she conducted a review of all autopsy photographs before trial.  She indicated counsel did not raise the issue at trial because she knew the victims had multiple cats.  Dryden, who prepared an evidence chart before trial, testified the orange fiber and hairs were not listed on this document, likely because a property receipt was not generated for this evidence.  She was also certain the fiber and hairs were not present when viewing evidence or else they would have been placed on the chart.  If the material was preserved, Dryden would have liked to have investigated further.

17

Under *Brady*, "when the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004). To be "materially exculpatory," "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). But, when evidence is only potentially useful, meaning, at most, it could have been tested and the results may have exonerated the defendant, due process is not violated, unless the defendant can show the State acted in bad faith. *Fisher*, 540 U.S. at 547-48. Bad faith exists when the material is destroyed "for the purpose of depriving the defendant of exculpatory evidence[.]" *State v. Armentrout*, 8 S.W.3d 99, 110 (Mo. banc 1999). To meet this test, the person "destroying . . . evidence must, at a minimum, have some knowledge that evidence is important to a pending criminal prosecution." *State v. Cox*, 328 S.W.3d 358, 365 (Mo. App. 2010).

Here, the fiber and hairs are not materially exculpatory, as they did not possess exculpatory value that was apparent before destruction. The orange fiber appeared to be a carpet strand, and the hairs appeared to be of pet origin, which is consistent with the victims' ownership of cats. These determinations were reasonable, and both conclusions call the exculpatory nature of the evidence into question. The fiber and hairs were only potentially useful because, at most, they could have been tested and may have been

18

helpful to Driskill. For these reasons, Driskill must show the evidence was destroyed in bad faith to establish a due process violation.

Driskill contends bad faith has been established because the fiber and hairs were physical evidence obtained from a victim's hand. The officers were also allegedly aware Driskill had a shaved head and dark facial hair at the time of arrest, so they knew the light hair was not Driskill's. Because of these facts, the officers purportedly knew the material was important to a pending criminal prosecution. Even assuming the officers knew this evidence was potentially important, Driskill has not shown bad faith, as the *Cox* Court explained understanding the evidence was relevant to a pending criminal prosecution is a baseline requirement. *See id.* In fact, the Supreme Court has noted the absence of "official animus towards [a defendant] or of a conscious effort to suppress exculpatory evidence" can impact the bad faith analysis. *Trombetta*, 467 U.S. at 488. *Cox* also referenced these factors, stating animus and a purpose to deprive the defendant of evidence did not exist. 328 S.W.3d at 364-65.

No evidence suggests the fiber and hairs were destroyed in bad faith to prevent Driskill from obtaining exculpatory evidence. The officers do not recall receiving this evidence. While the evidence was lost or misplaced at some point, there is no evidence this occurred because of animus towards Driskill or to hinder his defense. The evidence was also shown in the autopsy photograph and referenced in the autopsy report, further undermining the contention that the State destroyed this evidence to prevent Driskill from using it. The circuit court did not clearly err in denying this claim.

19

*D. Failure to Present Expert Testimony on Potential Contamination of DNA Evidence*

Driskill argues his trial counsel were ineffective for not presenting expert testimony, such as Dr. Dean Stetler, to establish DNA evidence was likely contaminated. Ruth Montgomery, a DNA analyst employed at the MSHP Crime Laboratory, testified at trial about developing a DNA profile from an unknown sample. She testified that the basic process involves using chemicals to break open the cells to access the DNA; isolating the DNA; quantifying the DNA; amplifying the DNA; using an instrument to create a profile of the signals from the amplifications stage; and comparing that DNA profile to a known DNA profile.

Montgomery performed the DNA analysis of C.W.'s two vaginal swabs from the sexual assault kit. Microscopic examination detected intact sperm cells on the swabs. Portions of the swabs were then placed in tubes for DNA analysis. "Swab 1" was subjected to differential extraction. A DNA profile was developed, and a mixture of at least two individuals was found. The major component of the mixture profile was consistent with the profile from C.W. The minor portion was consistent with the profile from Driskill. Additional analysis of the sample revealed the specific piece of DNA examined had been observed in one in 15,124 people in the US Y-STR database, which is used to calculate the occurrence of a profile within the population, and occurs in approximately one in 1,000 DNA samples.

The remainder of "Swab 1," after again being determined to have a minor component consistent with the profile from Driskill, was analyzed through the FBI Pop Stats database, which showed the observed mixture profile was 94.97 billion times more

20

likely to occur under the scenario it was a mixture of DNA from C.W. and Driskill as opposed to the scenario it was from a mixture of the DNA from C.W. and an unknown, unrelated individual in the population. At this point, the swab had been completely consumed.[7]

On cross-examination, Dryden elicited testimony "Swab 1" was tested multiple times. Driskill's boxers were also tested multiple times. A partial profile from the inside of Driskill's boxers was obtained. The major component matched Driskill, but the minor component did not match C.W. During closing argument, Driskill's trial counsel attacked the DNA evidence. They questioned why all tests were not presented and why the tests had different outcomes. Trial counsel also suggested DNA cross-contamination was present, arguing the DNA sample was contaminated because Montgomery tested Driskill's boxers and C.W.'s vaginal swab at the same time on one of the quantification steps. They argued retesting was not possible because the swab was completely consumed.

At the postconviction evidentiary hearing, Dr. Stetler testified he was retained by Driskill's postconviction counsel. Dr. Stetler reviewed the DNA analysis conducted by Montgomery and her trial testimony. He testified the presence of DNA in the reagent blanks in one of the quantification procedures was evidence of contamination. He stated

---

[7] "Swab 2" was not differentially extracted. "Swab 2," according to Montgomery's postconviction deposition, indicated an autosomal profile that was consistent with C.W. and that Driskill was eliminated as a source of that profile. A partial Y chromosome haplotype was developed that was consistent with the Y chromosome haplotype from Driskill at the alleles present.

21

that, because the reagent blank contained DNA, it would have been reasonable to perform a second quantification, which occurred here. At this quantification, cuttings from Driskill's boxers and "Swab 1" were placed on the same plate and run at the same time. Dr. Stetler posited that the boxers, because they contained Driskill's DNA profile, should not have been processed at the same time as the vaginal swabs. He could not say there was a high probability of contamination, but he said that there was "certainly a probability."

Dryden testified she was aware DNA was found in the reagent blank, which is used to ensure there is no cross-contamination, for the first vaginal swab cutting. She was also aware that, during the quantification step, cuttings from Driskill's boxer shorts were run at the same time as the portion of the vaginal swab. Dryden further testified she had consulted with an expert from Ohio who would have been able to testify contamination could have occurred. Dryden stated that counsel had a strategic reason for not calling a DNA expert to testify and that the subject had been discussed many times. She was concerned the State may have tried to correct the error in some way, including possible retesting. Ultimately, trial counsel consciously decided to cross-examine Montgomery to attempt to show the results were unreliable.

During Montgomery's postconviction deposition, she noted that the lab followed standard practices and that she made specific efforts to avoid cross-contamination. She testified about the timeframe in which evidence was handled and the steps taken to avoid contamination. Montgomery stated that, although the reagent blank revealed a quantity, when its value should have been zero, the quantity could have come from simple

22

fluorescence in the instrument or dust. Per the laboratory's protocol, the level of DNA found on the reagent blank was not considered high enough to amount to contamination. When the reagent blanks were amplified, Montgomery testified there was not anything there. Montgomery also explained the second extraction and quantification was performed to get additional autosomal information and not because of potential contamination. Driskill's boxers and the vaginal swabs were run at the same time because that was in accord with the scientifically accepted policy of the laboratory to test unknown samples. To contaminate anything at that point, the analyst would have to reenter the tube with the extracted DNA or reenter the well on the plate containing the sample.

> To prevail on a claim of ineffective assistance of counsel for failure to call a witness, the defendant must show: "(1) counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense."

*McFadden v. State*, 553 S.W.3d 289, 305 (Mo. banc 2018) (quoting *Deck*, 381 S.W.3d at 346). Because selection of witnesses is presumptively a choice of strategy, it typically cannot form the basis for an ineffective assistance of counsel claim. *Id.* "A trial strategy decision may only serve as a basis for ineffective counsel if the decision is unreasonable." *Id.* at 306 (quoting *McLaughlin v. State*, 378 S.W.3d 328, 337 (Mo. banc 2012)). "The question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable under all the circumstances." *Johnson v. State*, 406

S.W.3d 892, 901 (Mo. banc 2013) (quoting *Henderson v. State*, 111 S.W.3d 537, 540 (Mo. App. 2003)).

Driskill argues trial counsel's alleged strategy to not call an expert was based upon the unreasonable assumption that, had they done so, the State could have retested the evidence. As trial counsel admitted at the hearing, the State could not have done so because it was completely consumed during testing.[8] However, trial counsel's decision to not call an expert was reasonable strategy to prevent corrective actions by the State. "Counsel may choose to call or not call almost any type of witness or to introduce or not introduce any kind of evidence for strategic considerations." *Shockley*, 579 S.W.3d at 908 (quoting *Vaca v. State*, 314 S.W.3d 331, 337 (Mo. banc 2010)). Had a DNA expert, such as Dr. Stetler or the Ohio expert who was consulted before trial, testified, the State would have been able to argue the expert could not say contamination occurred. Each expert would have testified contamination was possible but would not be able to state the likelihood with any certainty. Trial counsel's strategy to not present such inconclusive testimony was reasonable. Further, the testimony would have permitted the State to call Montgomery to provide testimony similar to that she gave in her postconviction deposition, which concluded that she was confident there was no contamination.

Balanced with the unfavorable testimony from the others to whom Driskill related his story, there is not a reasonable probability that Dr. Stetler's testimony, which was far less decisive than Montgomery's testimony, would have changed the outcome of the trial.

---

[8] Dryden recalled *one* of the swabs was used up during testing.

24

The circuit court did not clearly err in finding trial counsel were not ineffective in failing to call an expert to establish DNA evidence was likely contaminated.

### E. Failure to Impeach Wallace

### 1. Inconsistent Statements to the Police

Driskill argues his trial counsel were ineffective for not investigating and impeaching Wallace's testimony that she could not find Driskill near Conway despite initially telling law enforcement she found and picked him up there. At trial, Wallace testified she and Driskill were at Prosperine on the Niangua River before the murders. She stated she "did a pill earlier in the day." At the river, she and Driskill had sex, and, when law enforcement interrupted, Driskill ran off into the woods with a gun. After talking to the law enforcement officer, Wallace went home.

Wallace further testified Driskill called her the following day, needing a ride. She drove to Conway to pick up Driskill on N Highway but could not locate him. After observing smoke in the distance and seeing first responders heading toward that area, Wallace left. Driskill later called her and related that he "pulled a home invasion and a robbery and a murder, a double homicide." Seeking guidance about what to do, Wallace went to Vause's apartment to talk to Vause's mother, Juanita Haught. Instead, Wallace encountered Driskill and heard more of his confession. Wallace testified that, after leaving Vause's apartment, she went to a gas station in Lebanon in hopes of finding Haught. As she entered the store, she encountered a police officer who, upon seeing her upset, inquired if something was wrong. The officer took Wallace to the sheriff's office and Sergeant Henry Folsom interviewed her.

25

On cross-examination, Driskill's trial counsel questioned Wallace about her sexual relationship with Driskill while also having a boyfriend, with whom she had a child, at the time. Wallace admitted she was cheating on and lying to her boyfriend. They questioned Wallace about the details of the evening at the river, including drug use. Trial counsel also questioned Wallace on her late contact with police, given Wallace's supposed knowledge of what Driskill told her about the crimes. Additionally, the cross-examination delved into potential inconsistences with statements about Wallace's phone calls.

In Sergeant Michael Mizer's reporting officer's narrative, which documented Wallace's first contact with law enforcement, he described encountering Wallace inside the gas station. He said Wallace was "crying hysterically." He further reported:

> Koontz[9] stated she received a phone call from Jesse Driskill stating he needed a ride from Conway, Mo back to Lebanon. Koontz stated Driskill told her he was on N Highway. Koontz stated she then responded to that area where she picked Driskill up. Koontz stated Driskill had blood all over him. Koontz further stated Driskill began to admit to her what he had done earlier in the evening.

Trial counsel did not impeach Wallace with this statement, which indicated she actually picked up Driskill in Conway. Trial counsel deposed Mizer prior to trial. At the evidentiary hearing, Mizer testified that, had he been called to testify, he would have testified consistently with his report. Folsom, who assisted with the investigation of the case, testified he interviewed Wallace at the sheriff's department. Wallace told Folsom

---

[9] Koontz was Wallace's last name at the time.

that Driskill requested to be picked up at a rural location, she left when she saw first responders and met Driskill later at a residence.

Trial counsel testified they did not remember why they did not impeach Wallace with her statement to Mizer that she picked up Driskill. Although impeachment was discussed and counsel indicated they would have wanted to impeach Wallace's credibility, neither attorney remembered the reason for not using the statement. The circuit court found, upon a review of the trial transcript, it was reasonable for trial counsel to prefer to keep the jury focused on Wallace's delay in speaking with the police and her mental state, instead of whether she picked up Driskill.

"Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Anderson*, 196 S.W.3d at 33. Although trial counsel could not articulate the rationale for not impeaching Wallace with the prior statement, focusing on Wallace's delayed contact with law enforcement was reasonable. Establishing Wallace was lying was part of trial counsel's strategy, but the impeachment value of her statement that she picked up Driskill was minimal. Wallace was in a state of extreme distress and incidentally stated she picked up Driskill. This alleged statement is refuted by Folsom's interview in the sheriff's department with Wallace and her trial testimony, both of which were removed from the initial hysteria in the store. The circuit court did not clearly err in finding trial counsel were not ineffective on this ground.

27

## 2. *Testimony Driskill Shaved C.W.'s Pubic Area*

Driskill claims his trial counsel were ineffective for not impeaching Wallace's testimony that Driskill told her he "shaved" C.W.'s pubic area. During voir dire, the State claimed C.W.'s pubic area was shaved to cover up evidence. Wallace testified at trial as to what she heard Driskill say at Vause's apartment. She said Driskill tried to clean up evidence, including shaving C.W.'s pubic area and pouring bleach inside of her. He then used gasoline. No other witness from Vause's apartment who heard Driskill recount his actions testified that C.W.'s pubic area was shaved.

At trial, Sergeant Folsom testified about his involvement in the murder investigation. He processed the crime scene. He noted there were burnt paper towels and other items between C.W.'s legs. He testified he did not notice any pubic hairs in the region, but that "[t]hey were very faint once [he] observed it and looked at it later." Folsom also testified he interviewed Wallace after the crimes. On cross-examination, trial counsel referenced the interview with Wallace, asking questions about her telephone calls with Driskill. The telephone calls were not verified or investigated by law enforcement.

Dr. Russell Deidiker, a forensic pathologist, reviewed the autopsy reports as well as photographs and testified at trial that there appeared to be sparse pubic hair.[10] He could not say C.W. had been recently shaved. A picture of C.W.'s pubic region was shown. Dr. Deidiker testified the amount of pubic hair was difficult to determine because

---

[10] The doctor who performed the autopsy passed away before trial.

28

of thermal injuries. On cross-examination, Dr. Deidiker testified that people lose some pubic hair as they begin to age. In closing argument, Driskill's trial counsel noted there was no evidence C.W.'s pubic area was shaved. Specifically, trial counsel noted the medical examiner testified that sparse pubic hair occurs with aging, that there was no evidence from the medical examiner C.W. was shaved, and that no razor was found with hair in it. The State made no mention of whether C.W. was shaved in closing argument.

At the postconviction evidentiary hearing, Folsom testified he prepared an affidavit requesting a sexual assault kit be performed on Driskill. In the affidavit, Folsom stated it appeared that "[t]he pubic hair had been removed from [C.W.'s] vaginal area" and that there was an attempt to start a fire in that area. He thought Wallace had told him about Driskill shaving the victim during the interview he conducted.[11] Folsom's affidavit recounts that a witness contacted law enforcement and related that Driskill stated he "shaved the female's vaginal area and cleaned her vaginal area with bleach."

Also testifying was Jenny Smith, a forensic chemist with the MSHP Crime Laboratory. She stated the pubic hair from C.W.'s sexual assault kit indicated charring or heat damage. She further stated the number of pubic hairs was typical to what would be obtained as part of pubic hair combings from a sexual assault kit. Upon questioning, she confirmed the length of the hairs was typical or did not strike her as outstanding.

---

[11] The transcript of the interview also reveals Wallace related this detail.

Turlington testified she could not recall anything about C.W.'s pubic region being shaved, but she had some recollection about there being evidence the hair was sparse. She testified she would have wanted to impeach Wallace's credibility.

Dryden testified that neither Folsom nor Wallace was impeached about the inconsistent statements as to whether C.W.'s pubic region was shaved. She said she had no trial strategy reason for failing to impeach the two witnesses about the pubic hair. She further noted she and Turlington had "missed the timeline"—i.e., they did not recognize events occurred in the following order: 1) Folsom was at the crime scene and saw the body; 2) Folsom interviewed Wallace, and 3) Wallace testified at trial that Driskill shaved C.W. The circuit court found, in part, that, regardless of whether C.W.'s pubic area was shaved, there was ample evidence to support the conclusion Driskill raped C.W., and it was reasonable for trial counsel to prefer to minimize any testimony that highlighted that alleged detail of the crime.

Trial counsel operated pursuant to the theory that Driskill did not commit the crime. It was reasonable to cast doubt on the passing reference from one witness that C.W.'s pubic area was shaved by arguing, in closing, a lack of evidence. This reasonable strategy cannot support a claim of ineffective assistance. *Anderson*, 196 S.W.3d at 33. The alternative, detailed questioning about the precise manner in which the perpetrator attempted to remove evidence, could reasonably be deemed unwise by competent, skilled counsel. Regardless, the jury was aware of the thermal injuries to C.W.'s pubic region and the sparse hair.

30

Wallace testified about the version of the crime she heard Driskill detail. The physical evidence C.W. was not shaved, which is far from dispositive, did not contradict whether Driskill made the statement that he shaved C.W. As a result, the impeachment value of this evidence is minimal. Considering the other evidence in this case, both physical evidence and accounts of witnesses who heard Driskill describe the crime, there is not a reasonable likelihood that impeaching Wallace on this detail would have resulted in a different outcome of the trial. The circuit court did not clearly err in denying this claim.

### F. Failure to Impeach Vause's Testimony J.W. Was Tied up

Driskill claims his trial counsel were ineffective for not investigating and impeaching Vause's testimony. On direct examination, Vause testified Driskill said he "tied the older man up" during the rape of C.W. In a follow-up question from the State, Vause repeated the statement. Driskill argues this testimony should have been impeached with the autopsy report showing no ligature marks. The possibility that J.W. may have been tied up was not referenced again.

On cross-examination, trial counsel focused on who was present in the apartment during Driskill's alleged confession. Vause testified she recalled that it was only her and Perry. Vause further testified she did not notice Driskill was covered in blood when he entered the apartment.

At the postconviction evidentiary hearing, Turlington testified she did not remember if they had a trial strategy for failing to impeach Vause with the fact that no ligature marks were found on J.W. at the autopsy. Dryden testified she had no strategy

31

for not impeaching Vause. The circuit court found, in part, that trial counsel were reasonable in concluding impeaching Vause on the point was not a significant area worthy of cross-examination.

The value of impeaching Vause regarding the existence of ligature marks with the autopsy report is questionable. Vause testified to Driskill's statement about J.W. being bound, and the autopsy report would not contradict whether Driskill made that statement. Cross-examination about this topic would also detract from Vause's testimony that was potentially helpful to the defense: Driskill made his statement solely to her and Perry, and Driskill was not covered in blood when he entered the apartment.

There is not a reasonable probability that impeaching Vause with the autopsy report would have changed the outcome of the trial. Overall, Vause's description of Driskill's statements were largely consistent with the testimony of other witnesses and the physical evidence. The fleeting reference to J.W. being bound was not highlighted by the State. No other witness referenced that detail. The circuit court did not clearly err in finding trial counsel were not ineffective on this ground.

### G. Failure to Introduce Evidence Vause Purportedly Used Victims' Last Name When Calling 911

Driskill claims Vause referred to the victims' last name when she called 911, even though the witnesses at Vause's apartment never claimed to have heard Driskill mention the victims' last name. There was no testimony from any of the people at Vause's apartment, where Driskill told his story, that he revealed the last name of the victims. In

Detective John Young's incident report, he discussed all aspects of the investigation. One paragraph stated:

> Laclede County 911 received a separate call from a subject stating that Jessie Driskill is passed out inside a residence located [at] 713 Parkhurst in Lebanon, Laclede County, Mo. The caller advised that Driskill is the person responsible for the [victims' last name] case. The caller also stated that Driskill had changed clothes and would be able to provide the clothing to us.

Trial counsel moved for disclosure of the 911 recordings referenced in Young's report, but they received only the recordings of two other calls from the case. Because trial counsel were aware 911 recordings were destroyed after varying amounts of time, they recalled making a further inquiry at some point about the call and being told it was destroyed.

Driskill alleges effective counsel would have requested and obtained the 911 recording before it was destroyed or presented the statement of Detective Young that "the caller advised that Driskill is the person responsible for the [victims' last name] case." Driskill claims the fact Vause used the victims' last name is impeaching because it suggests she received the name from someone other than Driskill.

Trial counsel requested the recordings and made further inquiry about the missing call. The actions of trial counsel appear to be reasonable in relation to the minimal impeachment value of the recording. The reference to the victims' last name in Young's report is potentially the product of Young's familiarity with the case while writing the report with the knowledge of the victims' identities. Or it could be the result of summarizing what a dispatcher relayed to Young, again with the name provided by a party other than the caller. The content of the recording is speculation, and Driskill

33

cannot demonstrate prejudice based on speculation of the content of the 911 call. The circuit court did not clearly err in holding trial counsel's actions did not constitute ineffective assistance.

### H. Failure to Show Driskill's Clothing and Shoes to the Jury

Driskill argues his trial counsel provided ineffective assistance by failing to show his clothing to the jury. Authorities seized a pair of jeans and a shirt from Vause's apartment. A pair of shoes was collected at the hospital. Various evidence in this case suggested blood was apparent on Driskill's clothes and shoes. Forensic reports describing the clothes indicated blood stains were present. Wallace testified Driskill's shoes were "filled with blood," and Cummins stated Driskill washed his shoes at the apartment.

At trial, the jeans, shirt, and shoes were admitted in evidence, but they were not shown to the jury. Instead, Montgomery testified that, after testing, she did not find any blood on the shirt or jeans. The shoes were not tested. While the negative test results were referenced at trial, Driskill argues the clothes should have been shown to the jury, so they could see the absence of blood firsthand, which would have altered the result of the trial.

At the postconviction evidentiary hearing, Turlington stated she did not recall a specific reason for failing to show Driskill's clothes to the jury, but she also noted the DNA report showing no blood could have impacted the decision. Dryden acknowledged that forensic testing is more persuasive than merely viewing the item. She further testified, trial counsel determined the laboratory result was the best evidence to show the

34

absence of blood. The circuit court found, after observing the clothes, that overt, visible signs of blood were not present. It determined introduction of the laboratory test was more compelling and unimpeachable than showing Driskill's clothes to the jury.

Typically, the decision to introduce evidence is a question of trial strategy that is virtually unchallengeable. *Johnson v. State*, 333 S.W.3d 459, 463-64 (Mo. banc 2011). Trial counsel's determination that the forensic test results constituted better evidence than exhibiting Driskill's clothes was a reasonable strategic decision. Even if trial counsel did not specifically recall the strategic reason behind utilizing the test results rather than showing the actual clothes, this cannot overcome the strong presumption that counsel's actions were based on sound strategy. *See Bullock*, 238 S.W.3d at 715. The circuit court did not clearly err in determining trial counsel were not ineffective regarding this matter.

*I. Failure to Introduce Evidence Regarding Size of the Cigarette Run*

Driskill contends his trial counsel were ineffective in failing to investigate and present evidence regarding the size of the Decade cigarette run. The victims' son testified his father smoked "Decades." When his father went to Lebanon, he would purchase a carton of the cigarettes. A package of Decade Menthol 100 cigarettes was found in the basement of the victims' residence. A package of Decade Menthol 100 cigarettes was also taken from Driskill's clothing after he was taken to the hospital following his arrest. Both packages had the same manufacturing run numbers. Testimony at trial showed Corporal Scott Mertens contacted the company that manufactured Decade cigarettes. The manufacturer "indicated that it was a very small run" and that the run had been distributed to a store in Lebanon.

35

In opening statements, the State referenced the Decade cigarettes with the same run number being found at the victim's house and in Driskill's clothing after he was taken into custody. The defense, in closing argument, suggested the Decade cigarettes from Driskill's clothing were not his because he changed clothes at Vause's apartment. The State's closing again referenced the run of cigarettes as part of the evidence establishing proof beyond a reasonable doubt:

> And these cigarettes incredibly -- incredibly, it would seem -- come from the same manufacturing run. Each pack, the one collected from the crime scene and the one taken from the Defendant's pocket, have the same run number on the side of the packet which is produced by a very small run of cigarettes made by the Cheyenne Cigarette Company, meaning that there is a high likelihood that the Defendant took one of those packs of cigarettes from the scene of the crime on the night in question.

Dean Ramsey Stacy, the quality director at the company that manufactures the Decade cigarettes, provided an affidavit during the postconviction proceedings. Stacy averred that the specific lot number from the cigarettes in this case contained a run of 43,200 packs of cigarettes. This was equivalent to 4,320 cartons or 72 cases.

At the postconviction evidentiary hearing, trial counsel testified they did not recall contacting the manufacturing company to determine how many packs of cigarettes contained the same run number. Turlington believed some inquiry was made about the topic. She stated she had some trial strategy for not obtaining the information, but she could not recall it. Dryden testified the manufacturer was not contacted and she did not specifically recall a trial strategy reason for failing to do so. Dryden further noted there was an unsuccessful attempt to determine what shops in the area sold that run of

cigarettes.[12]  The circuit court, upon review of the testimony and record, was confident the jury understood the limited value of this evidence and that other packages of cigarettes with the same run number existed.  It further found trial counsel were not ineffective for failing to prove the exact number of packages of cigarettes with the same lot number.

Driskill argues the fact the run of cigarettes contained more than 43,000 packs refuted one of the pillars of guilt the State relied on to show no reasonable doubt existed. He contends showing the number of packs of cigarettes would negate the State's argument that he was present in the victims' home because he had the same cigarettes. But evidence of the approximate number of packages contained in the run would not negate the inference that Driskill took the package from the victims' home.  The circumstantial evidence provided by the matching run numbers would not be enhanced nor diminished by establishing the exact quantity in the run.  Driskill was not prejudiced by trial counsel's failure to present evidence of the quantity of cigarettes in the run. Moreover, trial counsels' apparent strategy was to suggest Driskill obtained the package of cigarettes in the clothing from the apartment.  Accordingly, there would have been no value added by further investigation into the exact quantity of cigarettes in the run.  The circuit court did not clearly err in its findings.

---

[12] Mertens's original inquiry to the manufacturer resulted in the manufacturer faxing a list of distributors who received the cigarettes with the particular run number.  Trial counsel would have had access to this list.  The run was distributed to stores in multiple states, including a distributor in Lebanon.

*J. Failure to Object to Voir Dire Questioning*

During voir dire, the State repeatedly noted the crime was "horrible." Driskill argues his trial counsel were ineffective for not objecting to these comments. At the postconviction evidentiary hearing, trial counsel could not recall a reason for not making the objections. The circuit court found the State described the crime using the terms it chose in an effort to determine if each juror could properly consider the legally available sentences. It found these statements were not objectionable or prejudicial to Driskill.

The references to the "horrible" crime occurred in the context of the State questioning jurors about whether, knowing the facts of the case, they could equally consider imposing a death sentence or a sentence of life imprisonment.[13] The prosecutor frequently stated jurors may be able to think of crimes they considered more horrible. Contrary to Driskill's suggestion, these repeated statements to the venire panels did not serve to inform the jury that Driskill's case was among the worst and warranted the death penalty. Rather, the statements recognized the nature of the crime and served to inquire of jurors whether they could fairly consider the legally available penalties.

---

[13] After describing the crime in general terms, the prosecutor posited:

> Now, to me, that might be one of the *most horrible*—there's *more horrible* crimes than that, but that's a *pretty horrible* crime. Sir, I don't know what the *most horrible* crime for you or the other jurors is, but what I need to ask you is even though you can consider a death sentence, knowing those facts, can you give equal consideration to a life sentence?

(Emphasis added). Driskill's brief focuses on 24 examples of similar references to the "horrible" crime, although this is the sole example of the prosecutor stating it is, to him, "one of the most horrible" crimes. Notably, the prosecutor immediately corrected himself.

Driskill also notes that a prosecutor's statement of personal opinion or belief not based on evidence is improper. *See State v. Storey*, 901 S.W.2d 886, 901 (Mo. banc 1995). But the prosecutor did not go so far as to inject his personal opinion in the instances highlighted in Driskill's brief. The characterization of the crime as horrible was, like all murders, an apt description. Moreover, the brief factual scenario discussed by the prosecutor during voir dire did not rely on facts that went beyond the evidence to be presented at trial. Because the prosecutor's statements during voir dire were not improper, trial counsel were not ineffective for failing to object. The circuit court did not clearly err in rejecting this claim.

## II. *Alleged Penalty Phase Errors*

### A. Failure to Call a Psychiatrist to Testify at Penalty Phase Regarding Driskill's Complex PTSD

Driskill alleges his trial counsel were ineffective in failing to call an expert witness to testify, at the penalty phase, about certain aspects of his mental health. While some mental health testimony was presented during the penalty phase, Driskill contends testimony that he has complex post-traumatic stress disorder ("PTSD") resulting from childhood trauma and sexual abuse would have created a stronger defense under the mitigating factors in section 565.032.3.[14]

---

[14] All statutory references are to RSMo 2000. Section 565.032.3 provides, in part:
Statutory mitigating circumstances shall include the following:
. . .
(2) The murder in the first degree was committed while the defendant was under the influence of extreme mental or emotional disturbance;
. . .

Driskill called multiple experts during the penalty phase. Dr. Robert Hanlon, a clinical neuropsychologist, analyzed Driskill's cognitive functions after reviewing records, interviewing family as well as friends, meeting with Driskill for eight hours, and conducting tests. He testified Driskill had 1) been diagnosed with psychiatric disorders, including intermittent explosive disorder, bipolar disorder, and an anxiety disorder, 2) a history of suffering panic attacks, and 3) suffered abuse from his mother as a child. Dr. Hanlon also stated Driskill had a cognitive disorder, which impaired his cognitive functions. After testing, Dr. Hanlon concluded Driskill had neurocognitive deficits, such as executive dysfunction, memory disturbance, and visual reaction time, which were impacted by his bipolar disorder, a history of multiple concussions, and chronic polysubstance abuse. The deficits also made Driskill less able to control his behavior and impacted decision-making.

Dr. William Bernet, a professor emeritus of psychology, also testified in mitigation. He specialized in forensic psychiatry, with an emphasis in how genetics impact criminal or violent behavior. Dr. Bernet reviewed records, statements from family, friends, as well as a treating physician, and had Driskill undergo a genetic test. He mentioned records showed Driskill suffered abuse as a child. Dr. Bernet explained that the abuse, in connection with a low-activity version of a specific gene, makes it more likely an individual will be violent or arrested for committing a violent crime. As a

---

(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. . . .

At Driskill's trial, a jury instruction was provided for section 565.032.3(6) but not 565.032.3(2).

40

result, Driskill was significantly more likely to act violently, have trouble controlling his behavior, struggle conforming his behavior to typical expectations, and overreact to mild stressors. Dr. Reed Wouters, Driskill's treating physician, presented testimony during the penalty phase. He noted Driskill had been abused by his mother as a child and explained the abuse, in connection with other issues, caused Driskill to experience anxiety, paranoia, and mistrust. He previously diagnosed Driskill with a probable anxiety disorder, likely some depression, explosive behavior disorder, and anger issues.

At the postconviction hearing, Driskill presented evidence from Dr. Stephen Peterson, a forensic psychiatrist. Dr. Peterson reviewed numerous records, including academic, medical, psychiatric, law enforcement, and correctional documents; interviewed individuals familiar with Driskill; and conducted two in-person interviews with Driskill. He diagnosed Driskill with complex PTSD, intermittent explosive disorder, and polysubstance dependence disorder. Driskill's PTSD is complex because he has suffered multiple traumas. Dr. Peterson analyzed Driskill's mental health before, around, and after the offense. He noted Driskill's early life was difficult, as he had an unstable home environment, was physically and emotionally abused by his mother, spent time in the Illinois juvenile justice system, and endured sexual abuse. According to Dr. Peterson, many behaviors Driskill exhibited before the offense—including anxiety, depression, suicidal ideation, and behavioral as well as emotional control problems— were consistent with PTSD. Further, some of these behavioral issues are often incorrectly ascribed to other disorders, such as bipolar disorder or schizophrenia, if a full history for a patient is not kept.

41

Dr. Peterson further opined professionals often treat the symptoms of an issue rather than reaching the root cause. He suggested this occurred with Driskill, which explained why he had not been previously diagnosed with complex PTSD. Dr. Peterson stated that, in the records he reviewed, he did not see any close questioning about Driskill's history of sexual, physical, or emotional abuse and how this impacted his day-to-day functioning. He testified that records created after the offense supported his opinion. Specifically, Dr. Peterson reviewed the examination conducted by Dr. Hanlon. He also analyzed competency evaluations completed by Dr. Linda Gruenberg, an anxiety disorder expert, and Dr. Robert Fucetola, a neuropsychologist. Dr. Peterson did not lodge any complaints about the other experts' evaluations, but he felt they were asking different questions. For example, Dr. Hanlon and Dr. Fucetola are neuropsychologists, who focus on brain function rather than the causes of such behavior. Thus, a neuropsychological exam is not necessarily used to obtain a specific psychiatric diagnosis, although such an exam can help inform a psychiatric diagnosis. Dr. Gruenberg also focused on Driskill's competency to stand trial instead of the source of his mental illness. According to Dr. Peterson, all these factors explained why he diagnosed Driskill with complex PTSD while others did not.

During interviews with Driskill, Dr. Peterson also learned Driskill was sexually abused multiple times as an adolescent. The abuse was perpetrated by an older male and female. Driskill mentioned the sexual abuse in the first interview, but he was very guarded regarding the topic, stating he had not planned to share this information with anyone. Driskill terminated the interview when Dr. Peterson further questioned him

42

about the subject. Driskill was agitated and nervous after the interview and requested to be placed in isolation. Dr. Peterson testified sexual abuse victims are often reluctant to disclose the incident, as they often feel they are to blame. Driskill also seemed worried about the possibility of another inmate hearing of the sexual abuse. At the second interview, Driskill provided more details. Dr. Peterson explained the abusers forced Driskill to engage in sexual activity through threats to him and his brother and through use of seductive behavior. Dr. Peterson also speculated why other professionals were not able to discover Driskill's allegations of sexual abuse, positing 1) patients are usually not asked about sexual abuse in emergency situations because it often is not a base symptom unless the abuse just occurred; 2) patients do not mention sexual abuse because help likely will not be provided and this is a serious topic; and 3) professionals tend to ask about sexual abuse generally but drop the subject when told abuse has not occurred.

Dr. Peterson testified that Driskill's complex PTSD and intermittent explosive disorder could have caused him to be under the influence of extreme mental or emotional disturbance at the time of the crime and substantially impaired his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law. Dr. Peterson, however, acknowledged he did not specifically ask Driskill about the murders. Instead, he focused on the potential presence of a mental disease relevant to his conduct, not about criminal responsibility at the time of the offense. Dr. Peterson could not offer an opinion regarding the latter issue, but he clarified that Driskill's mental health problems were operative at the time of the offense, which would have impacted Driskill's thinking. Dr. Peterson also admitted Driskill took steps to cover up the crimes,

43

indicating Driskill understood what he was doing was wrong and could be investigated by others.

Turlington testified that trial counsel's penalty phase theory was based on Driskill's mental health issues, genetic predisposition toward violence, and history of physical abuse. She acknowledged that, while they did not call a psychiatrist, it would have been consistent with their theory. Turlington, however, articulated a strategic rationale for failing to call a psychiatrist—trial counsel believed they were presenting evidence regarding Driskill's mental health and history of abuse by other avenues. She noted Driskill's sexual abuse was not mentioned at trial, but other types of abuse and trauma were presented. Turlington stated that trial counsel investigated a lack of capacity defense by arranging a neuropsychological evaluation, a genetic test, and talking to a family doctor who treated Driskill for anxiety and depression. Moreover, trial counsel had two competency evaluations performed. Turlington also said they made a strategic, intentional decision not to call every mental health expert who had prepared information for, or was consulted by, the defense, as those experts had harmful information or could not present relevant material. She also explained she preferred to present mitigation evidence, when possible, from lay witnesses because her experience, as well as studies, show juries respond better to these witnesses.

Dryden testified that evidence regarding Driskill's PTSD and sexual abuse would have been helpful at the penalty phase. She stated there was no strategic reason for failing to call a psychiatrist. The circuit court, in part, reiterated trial counsel consulted multiple mental health experts, including two psychiatrists, while preparing for Driskill's

case.  Dr. Peterson acknowledged these experts were competent and capable.  The circuit court also found Dr. Peterson's testimony at the postconviction hearing was not persuasive or particularly credible because he implied Driskill might not have understood the wrongfulness of his conduct but did not specifically say that was true during the offenses.  Further, he did not discuss the crimes with Driskill.

A "viable defense" for the penalty phase portion of a death penalty trial is established if there is a reasonable probability the mitigation testimony would have outweighed the aggravation evidence, leading the jury to impose a sentence other than the death penalty.  *McFadden*, 553 S.W.3d at 308.  "In a death penalty case, trial counsel has an obligation to investigate and discover all reasonably available mitigating evidence[.]"  *Id.*  Yet trial counsel is not required to continue investigating when there is reason to believe further inquiry will be unhelpful and results will be unfruitful.  *Id.*  Because of real world constraints on time and human resources, trial counsel is entitled to great deference regarding the pursuit of witnesses.  *Id.* at 309.  Finally, "[d]efense counsel is not obligated to shop for an expert witness who might provide more favorable testimony."  *Johnson*, 333 S.W.3d at 464.

Trial counsel's selection of penalty phase experts was reasonable.  Turlington testified they made intentional decisions regarding the mental health testimony presented.  Trial counsel believed evidence regarding Driskill's history of abuse was adduced via other avenues, such as lay witnesses, which Turlington's experience and studies have shown is more impactful.  They also strategically decided not to call every potential expert.  Further, trial counsel made these decisions after investigating a lack of capacity

45

defense, consulting multiple qualified experts, subjecting Driskill to neuropsychological as well as genetic tests, and analyzing Driskill's medical history. Trial counsel engaged in due diligence, and their decision as to which witnesses to call was not unreasonable. Driskill has failed to overcome the strong presumption that trial counsel acted reasonably and rendered proper assistance.

The circuit court found Dr. Peterson's opinion was not credible, noting he did not speak with Driskill about the murders. This Court defers to the circuit court's credibility findings. *Shockley*, 579 S.W.3d at 892. Driskill contends Dr. Peterson did not need to discuss the crimes with him because the issue is whether the testimony would support the statutory mitigators. The mitigators utilized by Driskill, however, are assessed at the time of the crime. *See* section 565.032.3(2) ("The murder in the first degree was committed while the defendant was under the influence of extreme mental or emotional disturbance[.]"); section 565.032.3(6) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired[.]"). Dr. Peterson acknowledged Driskill attempted to cover up the murders, indicating he knew his actions were wrong and likely to be investigated. Dr. Peterson opined Driskill was suffering from mental health issues before the crime and that these issues likely persisted during the murders. Yet Dr. Peterson's failure to ask about the offenses limits the helpfulness of his testimony.

Dr. Peterson's testimony was also largely cumulative of other evidence presented. Driskill claims Dr. Peterson's testimony was crucial and stronger than evidence presented at trial because it explained Driskill had complex PTSD and experienced sexual abuse as

46

a child. During the penalty phase, Dr. Hanlon testified that Driskill had been previously diagnosed with intermittent explosive disorder, bipolar disorder, and an anxiety disorder. He also stated Driskill had a history of polysubstance dependence. Dr. Wouters reaffirmed Driskill struggled with anxiety, paranoia, and mistrust, explaining he diagnosed Driskill with a probable anxiety disorder, likely some depression, explosive behavior disorder, and anger issues. Both experts, as well as Dr. Bernet and multiple lay witnesses, testified Driskill was physically abused by his mother as a child. In contrast, Dr. Peterson diagnosed Driskill with complex PTSD, intermittent explosive disorder, and polysubstance dependence disorder. He also learned Driskill, in addition to physical abuse by his mother, was sexually abused during his childhood.

Despite these differences, the conclusions reached by the experts were similar. Dr. Hanlon explained Driskill was less able to control his behavior or make good decisions due to neurocognitive deficits. Dr. Bernet testified Driskill was more likely to act violently and less able to control his behavior or conform his actions to typical expectations because of his genetics and history of abuse. Dr. Peterson concluded Driskill's mental health issues could have caused him to be under the influence of extreme mental or emotional disturbance at the time of the crime and substantially impaired his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law. Even though the specific mental health problems might have differed, all experts reached the conclusion that these issues impacted Driskill's behavior. Given the weaknesses in Dr. Peterson's testimony, its similarity to other penalty phase evidence, and the circuit court's finding that Dr. Peterson was not credible, Driskill has

47

not established Dr. Peterson's testimony would have persuaded the jury to impose a life sentence. The circuit court did not clearly err in determining trial counsel were not ineffective for failing to call a psychiatrist during the penalty phase.

## B. Failure to Call Mitigation Witnesses

Driskill alleges his trial counsel were ineffective in failing to call four additional mitigation witnesses—Johnnie Gates, Michelle Clark, Peyton Stokesberry, and Jesse Simmons. Supposedly, these witnesses would have provided important background information regarding Driskill's mental health issues and demonstrated Driskill had a loving relationship with his children.

At the penalty phase, Driskill presented mitigating evidence from Amanda Warner, Crystal Fortune, and other lay witnesses. Warner, who dated Driskill's brother when she was 15, testified Driskill had a difficult childhood. She explained Driskill's father was an alcoholic, and Driskill's mother abused the boys. Warner stated she knew Driskill was bipolar; had issues with anxiety, even describing an instance where he blacked out as a result of a panic attack; and struggled with drugs. She stated Driskill was good with her children when medicated. Warner maintained contact with Driskill while he was in prison and planned to continue doing so.

Driskill's seventh grade teacher, Crystal Fortune, also testified. She suspected Driskill had been abused because he came to school with bruises. Fortune reported her suspicions to the principal, who believed this was not an abuse situation. Fortune disagreed and placed a letter of disagreement in Driskill's file. Trial counsel read a letter from Driskill's younger brother, which provided that Driskill served as a protector during

48

their childhood. The brothers spent a lot of time together, and Driskill was always available to help.

### 1. Johnnie Gates

Gates was incarcerated in the Illinois Juvenile Justice System starting in 1989. At the postconviction evidentiary hearing, Gates testified about the conditions in those facilities, stating they were worse than adult correctional institutions in Missouri. He explained fights were common, stronger individuals preyed on weaker individuals, and sexual abuse occurred. According to Gates, gangs were present and non-members were treated poorly. He further stated residents lived in a constant state of fear, unless they were in solitary confinement, because guards were unhelpful. Gates acknowledged he and Driskill were not in the system at same time. Instead, he met Driskill at a Missouri correctional institution sometime after 2008. Gates testified he could tell Driskill had been in the Illinois juvenile justice system by his demeanor. He later confirmed this hunch was correct, determining Driskill had been in at least the same intake facility. Both Turlington and Dryden testified they attempted to obtain Driskill's Illinois juvenile records, but they had been destroyed. They could not recall a strategic reason for not presenting evidence regarding the above conditions. The circuit court, in part, noted Gates and Driskill were not in the same facilities at the same time and determined his testimony would not have changed the outcome of trial.

This Court previously rejected a similar claim. *See McFadden*, 553 S.W.3d at 310. There, McFadden claimed trial counsel should have called two lay witnesses to testify about the terrible living conditions in his childhood neighborhood. *Id.* at 298, 310.

Because those witnesses, however, did not know McFadden and could only testify about general social conditions, their testimony was speculation. *Id.* at 310. Moreover, gangs were responsible for much of the violence in the area. *Id.* The prosecution could have used this information on cross-examination to suggest McFadden was a member, rather than a victim, of the gangs, which would have been harmful. *Id.* Similarly, Gates and Driskill were incarcerated in the Illinois juvenile justice system at different times. Gates could only speculate regarding the conditions Driskill experienced. His testimony would also open the door for potentially harmful cross-examination. Because Gates said non-gang members were treated poorly and stronger individuals preyed on weaker individuals, the prosecution could have utilized this information to suggest Driskill was a gang member or a perpetrator of violence instead of a victim.

### 2. *Michelle Clark*

Clark had a romantic relationship with Driskill when she was 15 and he was 17. During the postconviction proceedings, she explained their relationship began well. Clark testified Driskill revealed he had been sexually abused to her. She stated Driskill showed extreme paranoia, such as delusions or hallucinations, and provided an example of this behavior. Clark also explained she had a child with Driskill. One morning, later in her pregnancy, she went to Driskill's home and found him with another woman. At that point, Driskill said he was finished with Clark and suggested she have an abortion.

Turlington believed Clark was contacted, but she was not extensively interviewed. Dryden thought Driskill did not want Clark contacted. The circuit court noted Driskill

50

ended his relationship with Clark and suggested she abort her child, holding Clark did not present evidence that would have caused the jury to impose a different sentence.

Multiple penalty phase witnesses explained Driskill suffered from anxiety, paranoia, and other mental health issues. As a result, some of Clark's testimony would have been cumulative. To the extent the evidence was not cumulative, Clark's testimony would have allowed for damaging cross-examination. The prosecution could have utilized this information, which would have been harmful to Driskill.

### 3. Peyton Stokesberry and Jesse Simmons

Stokesberry believed Driskill was her father until around 2014 when she discovered that was not true. Despite this, she still considers him as her father and feels their relationship is important. Stokesberry acknowledged Driskill was frequently in prison during her childhood, but she stated that, when he was not in prison, he was a good father who often spent time with his children, taking them to the movies, to get ice cream, or spending the night with them. Stokesberry indicated she has stayed in contact with Driskill while he has been incarcerated by writing letters, making regular phone calls, and visiting. Driskill also has given her fatherly advice. While Stokesberry lives in Tennessee, she planned to visit Driskill and would remain involved in his life if he received a sentence of life without parole. Stokesberry believed trial counsel attempted to reach her. She would have testified, but her grandmother resisted because the family was being harassed.

Simmons is Driskill's son. At the evidentiary hearing, he testified he did not see Driskill much because he was often in prison. Yet he enjoyed spending time with

51

Driskill, and they were sometimes together on holidays and special occasions. Driskill also provided fatherly advice. Simmons intended to maintain his relationship with Driskill and would continue to do so if a sentence of life without parole was imposed. Simmons believed trial counsel attempted to reach him, and he would have testified if asked.

Turlington did not remember interviewing Stokesberry or Simmons. Dryden recalled attempting to contact Stokesberry, but Driskill did not want to involve her. Driskill's mother, with whom Stokesberry was living, prohibited trial counsel from contacting the child. Dryden further explained they could have subpoenaed Stokesberry but did not do so because there were concerns, after discussions with Driskill, she would be harmed if she testified. Dryden explained Simmons was also living with Driskill's mother at the time. Trial counsel had similar experiences attempting to have Simmons testify, and he was not called for the same reasons. The circuit court noted trial counsel contemplated calling the children as witnesses, but they decided not to because their grandmother was resistant. The circuit court also found the children, because of their minimal contact with Driskill, could offer only limited testimony.

The decision not to call Driskill's children was reasonable. "Trial counsel will not be found ineffective for failing to call an uncooperative witness." *Anderson*, 564 S.W.3d at 611. While the children themselves were willing to testify, other relatives were resistant. Both children were living with Driskill's mother and, as the individual responsible for the children, she prevented trial counsel from speaking to the children. Driskill himself did not want the children to testify due to concerns for their safety.

52

These fears were legitimate, as the family had already been subjected to harassment. Further, the children spent limited time, and had a limited relationship, with Driskill because he was often in prison. Due to these circumstances, Driskill did not establish calling his children would have persuaded the jury to impose a life sentence. The circuit court did not clearly err in rejecting this claim.

### III.  Constitutional Validity of Postconviction Time Limits

Driskill alleges Rule 29.15's time limits are unconstitutional, as postconviction counsel is unable to adequately investigate and prepare an amended motion in the allotted time.[15] To support this contention, Driskill references the extensive trial record from this case and notes postconviction counsel were representing individuals in two other capital postconviction cases at the same time. Driskill notes his amended petition challenged the constitutional validity of the time limits. The circuit court rejected the claim, noting, in part, the time limits have been upheld by this Court.

Rule 29.15(b) provides that, if a conviction is affirmed on appeal, a motion for postconviction relief must be filed within 90 days after issuance of the appellate court's mandate. In turn, Rule 29.15(g) specifies the time limit for filing an amended motion. This Court has consistently held that Rule 29.15's time limits are constitutional. *Price v. State*, 422 S.W.3d 292, 297 (Mo. banc 2014); *State v. Ervin*, 835 S.W.2d 905, 929 (Mo. banc 1992). The limitations, which serve the important purposes of "avoiding delay in

---

[15] Driskill maintains seven additional, untimely claims should be considered. While the circuit court heard evidence on one claim—that the State committed a *Brady* violation by failing to disclose contamination and technical error logs from the MSHP Laboratory—it noted Driskill admitted the claim was not pleaded.

53

the processing of prisoners['] claims and prevent[ing] the litigation of stale claims[,]" are also reasonable. *Day v. State*, 770 S.W.2d 692, 695 (Mo. banc 1989).[16]

Driskill briefly argues postconviction counsel cannot provide effective assistance of counsel within Rule 29.15's time limits. Driskill raises only cursory allegations and fails to specifically demonstrate how he has been prejudiced by these time limits. Without pointing to a certain portion or page of the opinion, he cites *Martinez v. Ryan*, 566 U.S. 1 (2012), to contend postconviction counsel must be effective and raise all meritorious claims to comply with due process. *Martinez*, however, addressed a different issue and did not create such a requirement. *See id.* at 8-9. This Court has said "[t]he lack of any constitutional right to counsel in post-conviction proceedings . . . precludes claims based on the diligence or competence of post-conviction counsel (appointed or retained) and such claims are 'categorically unreviewable.'" *Price*, 422 S.W.3d at 297 (citation omitted). Driskill's attempt to transform his time-limit argument into an ineffective assistance of postconviction counsel argument fails. The claims were not asserted in a timely filed amended motion. The circuit court properly determined Rule 29.15's time limits were constitutional, and failure to consider the additional claims was not clear error.

---

[16] Driskill notes this Court, in Rule 29.16(e), recently extended the time limit for filing a postconviction relief motion in capital cases. The provision of additional time, however, does not establish the previous requirement was unconstitutional.

54

## Conclusion

The circuit court's findings of fact and conclusions of law are not clearly erroneous. The judgment denying Driskill postconviction relief is affirmed.

_____
Mary R. Russell, Judge

Draper, C.J., Wilson, Powell, Breckenridge
and Fischer, JJ., concur.